## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

RICHARD BANKHEAD,          )
                             )
    PLAINTIFF,            )
                             )    **CASE NO.: 03: 07 CV208-MHT**
AMERICAN SUZUKI MOTOR CORP., et al.,  )
                             )
    DEFENDANTS.         )
                             )

## PLAINTIFF RICHARD BANKHEAD'S RESPONSE IN OPPOSITION TO DEFENDANT AMERICAN SUZUKI MOTOR CORPORATION'S MOTION FOR SUMMARY JUDGEMENT

COMES NOW, Plaintiff Richard Bankhead (hereinafter Plaintiff "Bankhead"), by and through counsel, who hereby files this Response to Defendant American Suzuki Motor Corporation's (hereinafter Defendant "Suzuki") Motion for Summary Judgment, and as grounds therefor alleges as follows:

### PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

Plaintiff, Richard E. Bankhead, was born on September 7, 1987 and resides with his parents at 50 Lee Road 287, Smith Station, Alabama. (Bankhead Dep. pg. 5). Plaintiff suffered injuries on or about August 1, 2006, while riding a 2006 Suzuki GSX 750 motorcycle that had been purchased by his parents at Extreme Power Sports in Columbus, Georgia. *See* Plaintiff's Complaint at ¶ 6-7. Plaintiff had previously owned two other motorcycles. (Bankhead Dep. pgs. 25-27). His first, was a Suzuki GSF500 and his second was a Yamaha YZF600. (Bankhead Dep. pgs. 25-27). Plaintiff had also owned a Honda XR80 dirt bike. (Bankhead Dep. pg. 44). Plaintiff has been riding motorcycles since he was thirteen years old. (Bankhead Dep. pg. 46).

At the time of injury, Plaintiff was employed with Extreme Power Sports. (Bankhead Dep.

pg. 14). Extreme Power Sports sells motorcycles, ATVs, jet skis, golf carts, scooters and other recreational vehicles. (Bankhead Dep. pgs. 15-16). According to Plaintiff, his duties at Extreme Power Sports were to assemble the products before they were sold. (Bankhead Dep. pgs 15-16). He also serviced motorcycles by changing the oil and checking tire pressure. (Bankhead Dep. pg. 17).

Prior to Plaintiff's employment with Extreme Motor Sports, Plaintiff was employed as a mechanic at Dirty South Customs and Ultimate Cyclez in Phenix City, Alabama. (Bankhead Dep. pgs. 20-21). Both employers were motorcycle shops. (Bankhead Dep. pgs. 20-21). Plaintiff's duties included changing oil, performing tune-ups and changing tires. (Bankhead Dep. pg. 22). Plaintiff also assisted in customizing motorcycles. (Bankhead Dep. pg. 22). He worked on both American and Japanese motorcycles. (Bankhead Dep. pgs. 21-23). An example of plaintiff's duties are as follows:

> Q: What type stuff would they customize on bikes?
> A: Anything
> Q: Just give me some examples.
> A: They scratch them, put big tire kits on them, hot rod systems, exhaust, just different stuff like that.

(Bankhead Dep. at pg. 25).

Plaintiff did not assemble the motorcycle that was purchased by his parents and is the underlying cause of the present lawsuit. (Bankhead Dep. pg. 17). Plaintiff stated in deposition that the Suzuki GSX-R750 motorcycle comes out of the box only requiring that the side mirrors be installed. (Bankhead Dep. pg. 17). **At the time, Plaintiff purchased the Suzuki GSX-R750 motorcycle, the motorcycle was brand new.** (Bankhead Dep. pg. 50-52). **The motorcycle had only eleven miles on it.** (Bankhead Dep. pg. 51); *see also* a true and correct copy of Plaintiff Bankhead's Affidavit which is attached hereto and incorporated herein as **Exhibit "1."** Those miles were put on it from the test drive. (Bankhead Dep. pg 48). The Plaintiff did not perform the test

drive. (Bankhead Dep. pg. 48). The Plaintiff testified as follows:

Q:  So when you rode off the lot, it had 11 miles?
A:  Yes, sir.
Q:  So just tell me about the day you rode it off when you purchased it Just walk me through what happened.
A:  I didn't take it home until after I had gotten off of work., went to where my car was. I got my wallet, then I was going to my friend's house, but I didn't ever make it there, because he was going to take me to my car so I could take my car home.
Q:  So you were working at Extreme all that day?
A:  Yes, sir.
Q:  What time was it when you left for work?
A:  It was like 6-something. In between 6 and 6:30.
Q:  6:30 at night?
A:  Yes, sir
Q:  So your car is in the parking lot?
A:  No, it was in the parking lot of Lowe's.
    Yeah it was in the parking lot of Lowe's.
Q:  Is that somewhere close by?
A:  It's down the street, yes sir.
Q:  So you left work, you ride the bike to Lowe's
A:  Yes, sir.
Q:  Then where did you go?
A:  I was headed to my friend's house.
Q:  What road is that?
A:  It was in Phenix City?
Q:  You were on Highway 280?
A:  Yes, sir, when the accident happened.

(Bankhead Dep. pgs. 52-53).

Q:  Then what?
A:  **Then I got to Phenix City Home Depot, stopped at red light, there was just a flame come up,** so that's when I was trying to get off the bike. The bike went one way, and I went the other.
Q:  Okay. So you stopped at the red light by Home Depot?
A:  Yes, sir.
Q:  And you take a – your stopped at the red light and then what happened?
A:  I just took off whenever the light turned green.
Q:  Going straight or –
A:  Yes, sir, going straight.

(Bankhead Dep. pg. 54)

Q:   All right. And you say that you were stopped at the light and the light turns green?

A:   I just take off

Q:   So you hit the gas?

A:   Yes, sir. I didn't take off real fast or anything like that; I was just taking off like normal. **And all of a sudden, it's like a flash fire**, and that's when I was trying to get off of it, so I pushed the bike one way, then I jumped off the other way.

Q:   How fast were you going?

A:   About 10 to 15. Only going that fast – **they said if I had been going faster, it would probably blew up.**

(Bankhead Dep. pg. 56)

Q:   Okay. So you say you were at the – back to the accident. You say you were at the red light. Light turns green and you go, and I guess you get up to about 10 or 15, and I guess that's when the accident happened?

A:   Yes, sir.

Q:   Did you hear any loud noise or pop or –

A:   **No, sir. But it was a woman behind me and she said she seen smoke first.** But being on a motorcycle, I couldn't see it.

Q:   **What side of the bike did the flames come out of?**

A:   **The left side.**

Q:   **Was it like a – you described it as a flash fire. Did just flames come up and then go away or –**

A:   **It just came up real quick and that's – I don't know if it actually went away, but when I jumped off of it, it wasn't there no more.**

Q:   **Okay. How long were you on the bike when you saw the flames before you jumped off?**

A:   **Not that long, just long enough for it to burn my arm.**

Q:   **How high did they come?**

A:   **It was like – like right there.**

Q:   **Up to the top of your arm?**

A:   **Yes, sir.**

(Bankhead Dep. pgs. 58-60).

## SUMMARY JUDGMENT STANDARD

In order for a court to grant a motion for summary judgment, the moving party must show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56 (c). "On a motion for summary judgment, the

court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party." *White v. Wells Fargo Guard Services*, 908 F.Supp. 1570, 1574 (M.D. Ala. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Indeed, "[t]he party asking for summary judgment 'always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.'" *Hester v. Brown*, 512 F.Supp.2d 1228, 1231 (M.D. Ala. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." *Id.* (citing *Celotex*, 477 U.S. at 322-24).

"A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *White v. Wells Fargo Guard Services*, 908 F.Supp. 1570, 1575 (M.D. Ala.1995) (citing *Anderson*, 477 U.S. at 248; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989)). "In ruling on a motion for summary judgment, the function of the court is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial.'" *Loyd v. Ram Industries, Inc.*, 64 F.Supp.2d 1235, 1237 (S.D. Ala.1999) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 242-43 (1986)).

## LEGAL ARGUMENT

Defendant argues that summary judgment should be granted as a matter of law as to Plaintiff Bankhead's claims under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD), negligence, wantonness, and for breach of implied warranty. The grounds of Defendant's Motion

is premised upon the mistaken belief that Plaintiff Bankhead has not provided or identified Defendant with a named expert witness needed to prove liability under AEMLD. However, Defendant's argument is without merit, and, as further addressed, *infra*, summary judgment should not be granted as a matter of law.

I.    **Summary Judgment is inappropriate because Plaintiff Bankhead has provided Defendant Suzuki with its named expert in compliance with this Court's Uniform Scheduling Order.**

The Defendant argues that summary judgment should be granted as a matter of law as to Plaintiff Bankhead's claims because he has not offered expert evidence in support of his claim pursuant to the requirements of this Court's Uniform Scheduling Order entered by the Court on April 4, 2007. However, Defendant is incorrect in its assertion that Plaintiff Bankhead has not identified an expert witness. Indeed, Plaintiff Bankhead has identified Mr. Bryan Oschman as expert witness. A true and correct copy of Mr. Bryan Oschman's Affidavit and accompanying report from inspection is attached hereto and incorporated here in as **Exhibit "2."**

"Determination of whether witness qualifies as an expert is within sound discretion of trial court, and that determination will be reversed only if it is found to be palpably wrong." Further, "to qualify as expert, witness must have knowledge, skill, experience, or training that his opinion will be considered in reason as giving trier of fact light upon question to be determined." *Britt v. Chrysler Corporation Corp.*, 699 So.2d 179

Mr. Oschman has been a motorcycle mechanic for approximately twenty years. *See* **Exhibit "2."** He is the former owner of Ultimate Cyclez, a motorcycle mechanic shop, which was located in Columbus, Georgia. *See* **Exhibit "2."** Mr. Oschman personally inspected the Plaintiff's motorcycle and prepared a report stating that among other things that it "looks as if wiring near starter motor is 'crimped' and grounded out causing a fire on right side of motor causing flames to

rise along frame." *See* **Exhibit "2."** The report further states that this is "noticeable due to charcoal marks and residue on plastic." *See* **Exhibit "2."** Further, in Mr. Oschman's attached affidavit, Mr. Oschman opines that damage is attributed to "a manufacturing flaw and not driver error." *See* **Exhibit "2".**

A. **Summary Judgement is inappropriate on Plaintiff Bankhead's AEMLD claims because genuine issues of material fact exist as to whether the motorcycle which injured the Plaintiff was defective.**

Defendant's Motion states that Plaintiff Bankhead "must prove that the product is unreasonably dangerous" and that "expert testimony is ordinarily required to prove a claim under AEMLD" under subheadings "A" and "B" of its motion, respectively. *See* Defendant's Motion for Summary Judgment at pp. 4-6. However, Defendant Suzuki, the moving party for purposes of the herein summary judgment, fails to allege any facts under these two points to establish the absence of a genuine issue of material fact as to these required elements. Rather, Defendant gives a nice rendition of the law in this area. Under subheading "C" of Defendant's Motion, Defendant, in essence, reinstates its argument that Plaintiff has failed to provide expert testimony in support that the motorcycle was defective. To that extent, Plaintiff reinstates his argument as stated, *supra*, and presents further argument that genuine issues of material fact exist as discussed below.

To establish liability under AEMLD, the plaintiff must show:

> "(1) [that] he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.(2) Showing these elements, the plaintiff has proved a prima facie case although(a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.

*Sapp v. Beech Aircraft Corp.*, 564 So.2d 418, 419 (Ala. 1990) (citing *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 132 (Ala. 1976); *Atkins v. American Motors Corp.*, 335 So.2d 134, 141 (Ala. 1976). Furthermore, "[t]he burden of proof rests with the injured consumer to prove that the product left the defendant's control in an unreasonably damaged condition not fit for its expected use, and that which rendered the product to be in such an unfit condition in fact caused the injury. *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.*, 395 So.2d 991, 995 (Ala.1981) (overruled on other grounds).

Again, genuine issues of material fact exist as to whether the motorcycle was defective because Plaintiff has provided a report from Bryan Oschman stating the grounds of his opinion as to the origin of the 2006 Suzuki motorcycle's defect. *See* **Exhibit "2."** Mr. Oschman, in his report, makes mention of the fact that flames rose along the frame of the motorcycle which is "noticeable due to charcoal and residue on the plastic." *See* **Exhibit "2."** Furthermore, Mr. Oschaman's opinion that the motorcycle was defective is strengthened by the fact that the evidence shows that when Plaintiff took possession of the motorcycle, the motorcycle was brand new and only had eleven (11) miles on it. (Bankhead Dep. pg. 48). Indeed, when Plaintiff Bankhead suffered his injuries, the motorcycle only had 23 miles on it. *See* **Exhibit "1."**

Defendant's cite in its brief an inspection report of its retained expert, Richard Oxton. Mr. Oxton, stated in his report that "[t]here is no evidence of a fire or heat related damage to any portion of the motorcycle." *See* <u>Defendant's Motion for Summary Judgment</u> at 2. While Defendant's paid expert witness' position is noted, it is directly in contradiction to Plaintiff's expert witness' position. Therefore, a genuine issue of material fact exists as to whether the product was defective and Defendant should not be granted summary judgment as a matter of law.

Furthermore, Plaintiff testified in his deposition that he was stopped at a red light. (Bankhead

Dep. pg.58-60). When the light turned green, Plaintiff accelerated at a low rate of speed. (Bankhead

Dep. pgs. 58-60). Then all of a sudden, a flame came up over the bike and burned his body.

(Bankhead Dep. pgs. 58-60); *see also* **Exhibit "1."** Clearly, flames discharging out of the side of a

brand new motorcycle is clear evidence that the product is defective, and thus unreasonably

dangerous. Furthermore, Plaintiff testified that the product reached the consumer in substantially

the same condition in which it was sold. (*See* Bankhead Dep. pg 17). Plaintiff also testified that he

received the injuries from his use of the product. *See* **Exhibit "1."** Therefore, on the grounds that

there is a factual dispute as to the issue of defectiveness of the product, it is matter which should be

determined by a jury and is thus not proper for summary judgement.

As previously stated, Plaintiff's expert witness' position is in direct contradiction to

Defendant's expert witness' position, thus showing that there is a genuine issue of material fact as

to whether the motorcycle was defective. Therefore, the contradictory positions of both experts is

sufficient to show that genuine issues of material fact exist and further supports the Plaintiff's

position that Defendant's Motion for Summary Judgement should be denied as a matter of law by

this Honorable Court.

**II.    Plaintiff's claims based on negligence and wantonness should survive summary judgement.**

Plaintiff has provided ample evidence to substantiate survival of his claims for (1) negligence

and (2) wantonness. Indeed, evidence has been provided by plaintiff in the form of expert testimony,

affidavits and plaintiff's own deposition testimony.

In order to prove a prima facie case of negligence, a plaintiff must provide substantial

evidence that a defendant (a) breached (2) a duty, which (3) proximately caused (4) plaintiff's injury.

*Key v. Compass Bank, Inc.*, 826 So.2d 159 (Ala. Civ. App. 2001). "Summary Judgements are

generally not appropriate in negligence actions." *Gordon v. Mobile Greyhound Park*, 592 So.2d, 208, 210 (Ala.1991). "Selling a dangerously unsafe chattel is negligence within itself." *Atkins v. American Motors Corp.*, 335 So.2d 134.

Plaintiff has proven all elements needed to establish his prima facie claim of negligence. Plaintiff has shown that defendant had a duty not to sell or manufacture a defective product. Plaintiff has provided expert testimony stating manufacturing flaw. Plaintiff has shown that the breach of said duty proximately cause the plaintiff's injuries.

Again, plaintiff has established that there exists more than a genuine issue of material fact in dispute. Consequently, defendant's Motion for Summary Judgement is due to be denied. Plaintiff's claims of negligence should survive defendant's motion.

Wantonness is the "conscious doing of some act or the omission of some act or the omission of some duty under the knowledge of the existing conditions, and conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Savage Indus. v. Duke*, 598 So.2d 856, 859 (Ala. 1992) (quoting *Smith v. Bradford*, 475 So.2d 526, 528-29 (Ala. 1986)); Ala. Code 1975 § 6-11-20 (b) (3). Again, plaintiff's claims support the survival of summary judgement in regard to wantonness. There exists a genuine issue of material fact in regard to the wantonness count. Respectfully, such a matter should be reserved for a jury and not proper for summary judgement.

### III.    Plaintiff agrees to dismiss its claims for breach of implied warranty.

Upon further research of the facts, claims, and parties to this action, Plaintiff agrees that Defendant's Motion for Summary Judgment should be granted as to Plaintiff's implied warranty claims, but not to all other claims as discussed, *supra*.

Respectfully Submitted,

/s Stewart S. Wilbanks
Stewart S. Wilbanks
DILLARD AND ASSOCIATES, L.L.C
Fourth Floor, Berry Building
2015 Second Avenue North
Birmingham, Alabama 35203
Telephone: (205) 251-2823
Fax: (205) 251-3832
Email: dillardandassoc@aol.com
ASB-3234-W80W

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2007, I electronically filed the foregoing with the Clerk of the Court using the CMF/ECF system which will send notification of such filing to the following:

**John D. Mayo, Esq.**
Lightfoot, Franklin & White
The Clark Building
400 North 20th Street
Birmingham, AL 35203

**Stewart Andrew Kelly, Esq.**
Lightfoot, Franklin & White, L.L.C
400 20th Street N.
Birmingham, AL 35203
dkelly@lfwlaw.com

**Zachary T. Collins, Esq.**
207 Montgomery Street
Ste. 213
Montgomery, AL 36104
zackcollins@tmail.com

/s/ Stewart S. Wilbanks
Of Counsel

# Exhibit 1
# Affidavit of Richard E. Bankhead

## IN THE MIDDLE DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

| | |
|---|---|
| RICHARD E. BANKHEAD, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO: 3:07-CV-208 |
| | ) |
| | ) |
| AMERICAN SUZUKI MOTOR CORP., | ) |
| | ) |
| | ) |
| Defendant. | ) |

### AFFIDAVIT OF RICHARD E. BANKHEAD

Before me, the undersigned Notary Public, personally appeared the affidavit, who being known to me, and first duly sworn, did depose and state as follows:

My name is Richard E. Bankhead and my address is 50 Lee Road 287, Smiths, Alabama 36877. I am over the age of nineteen (19) and I am the Plaintiff in the above styled cause of action.

I have owned several motorcycles in the past. I have experience riding motorcycles. I am comfortable riding motorcycles. I have worked at motorcycle dealerships and worked at custom motorcycle shops. I have worked as a mechanic and I have worked on motorcycles.

On or about August 2, 2006, I was injured while driving a 2006 Suzuki GSX-R750 motorcycle. My family had purchased the motorcycle brand new. At the time I took possession, the motorcycle had approximately eleven (11) miles.

The same day the motorcycle was purchased, I had left work and was riding the motorcycle to a friend's home. I stopped at a red light. When the light turned green, I accelerated. I was traveling at a low rate of speed when all of a sudden, a flame came up from the bike and burned my body. I had only traveled a few feet. The motorcycle had approximately twenty three (23) miles on it at the time of injury.

I did nothing out of the ordinary when I received injuries on August 2, 2006. I was not speeding or riding recklessly. I merely accelerated after being stopped at a red light. As a result of my injuries, I was transported by ambulance and treated by a Columbus, Georgia hospital.

**FURTHER AFFIANT SAYETH NOT.**

*Richard E. Bankhead*
Richard E. Bankhead

.STATE OF ALABAMA          )
_____ COUNTY           )

Subscribed and sworn to before me by Yolanda Sherrell Parker, on this the ___ day of January, 2008.

_____
Notary Public

My Commission Expires___ 7/1/09

Of Counsel:

Dillard & Associates, LLC
2015 2nd Avenue North
4th Floor
Birmingham, AL 35203
(205) 251-2823 (Telephone)
(205) 251-3832 Facsimile)

# Exhibit 2
# Affidavit of Bryan Oschman

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RICHARD E. BANKHEAD,                     )
                                         )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )    CIVIL ACTION NO: 3:07 CV 208-MHT
                                         )
                                         )
AMERICAN SUZUKI CORP., et al.            )
                                         )
                                         )
        Defendant.                       )

## AFFIDAVIT OF BRYAN OSCHMAN

Before me, the undersigned Notary Public, personally appeared the affidavit, who being known to me, and first duly sworn, did depose and state as follows:

My name is Bryan Oschman and my address is 20 Old Willimantic Road, Chaplin, CT, 06335. I am over nineteen (19) years of age.

I am a former employee/owner of Ultimate Cyclez located at 4103 Holly Avenue in Columbus, Georgia.

On or about August 9, 2006, I inspected a 2006 Suzuki GS XR 750 that belonged to Richard E. Bankhead. A copy of my report is attached to my affidavit.

I have a mechanical background and I have worked on, repaired, and ridden motorcycles for many years.

After inspection, I found that wiring near the starter motor was "crimped" and grounded out causing a fire on the right side of the motor. This caused flames to rise along frame. This is noticeable due to charcoal and residue on plastic. At the time, Mr. Bankhead's motorcycle only had 23 miles. I have attributed the damage to a manufacturing flaw and not driver error.

FURTHER AFFIANT SAYETH NOT.

**Bryan Oschman**

STATE OF _Alabama_

_Jefferson_ , **COUNTY**

Subscribed and sworn to before me by Bryan Oschman, on this the 29th day of
_January_ , **2008.**

Notary Public

**My Commission Expires:** 7/1/09

2

Victim A. P. E.
4103 Holly Ave.
Columbus GA 31904
706-494-1611

# AUTO REPAIR ORDER

NAME: Don Joseph
ADDRESS: 50 Lee RD 287            Ph#
CITY. STATE: South   AL   36877   (334-214-5969)

| QUAN. | PART NO. | NAME OF PART | PRICE | | | |
|---|---|---|---|---|---|---|
| | | Diagnos - Looks as if | | **CUSTOMER'S INFORMATION** | | |
| | | wiring near Starter | | DATE 8-9-06 | CUSTOMER'S ORDER NO. | WHEN PROMISED | PHONE |
| | | motor is "crimped" | | YEAR • MAKE • MODEL 2006 Suzuki GSXR | | SERIAL NO. JS1GR7KA862108568 |
| | | and grounded out | | | MOTOR NO. | |
| | | causing a fire | | LICENSE NO. | ODOMETER 00023 miles | WRITTEN BY Bryan Oschman |
| | | on right side | | | | |
| | | of motor causing | | ☐ LUBE  ☐ OIL CHANGE  ☐ FLUSH TRANS.  ☐ FLUSH DIFF.  ☐ WASH  ☐ POLISH | | |
| | | flames to rise | | | | |
| | | along frame | | | | |
| | | noticable due | | | | |
| | | to charcoal marks | | | | |
| | | and residue on plastics. | | | | |

| | | | | GAS, OIL & GREASE | ACCESSORIES | LABOR ONLY | |
|---|---|---|---|---|---|---|---|
| | | | | GALS. GAS | | PARTS | |
| | TOTAL PARTS | | | QTS. OIL | | ACCESSORIES | |
| **MECHANICS RECOMMENDATIONS** | | | | LBS. GREASE | | GAS, OIL & GREASE | |
| | | | | TOTAL GAS OIL & GREASE | | MISC. MERCHANDISE | |
| | | | | | | SUBLET REPAIRS | |
| | | | | ☐ RETAIN PARTS | | | |
| | | | | ☐ DESTROY PARTS | TOTAL ACCESSORIES | TAX | |
| ESTIMATE AMOUNT • PARTS & LABOR ▶ | | | | AUTHORIZED BY | | TOTAL | |

I HEREBY AUTHORIZE THE ABOVE REPAIR WORK TO BE DONE ALONG WITH THE NECESSARY MATERIAL, AND HEREBY GRANT YOU AND/OR YOUR EMPLOYEES PERMISSION TO OPERATE THE CAR, TRUCK, OR VEHICLE HEREIN DESCRIBED ON STREETS, HIGHWAYS OR ELSEWHERE FOR THE PURPOSE OF TESTING AND/OR INSPECTION. AN EXPRESS MECHANIC'S LIEN IS HEREBY ACKNOWLEDGED ON ABOVE CAR, TRUCK OR VEHICLE TO SECURE THE AMOUNT OF REPAIRS THERETO.

edana  GT3870

YOU ARE ENTITLED TO A PRICE ESTIMATE FOR THE REPAIRS YOU HAVE AUTHORIZED. THE REPAIR PRICE MAY BE LESS THAN THE ESTIMATE, BUT WILL NOT EXCEED THE ESTIMATE WITHOUT YOUR PERMISSION. YOUR SIGNATURE WILL INDICATE YOUR ESTIMATE SELECTION.

TEARDOWN ESTIMATE: I UNDERSTAND THAT MY CAR WILL BE REASSEMBLED WITHIN _____ DAYS OF THE DATE SHOWN, IF I CHOOSE NOT TO AUTHORIZE THE SERVICES RECOMMENDED.

1. I request an estimate in writing before you begin repairs. _____
2. Please proceed with repairs, but call me before authorizing if the price will exceed $ _____
3. I do not want an estimate. _____

**AUTO REPAIR ORDER**

# RICHARD E. BANKHEAD
## DEPOSITION TRANSCRIPT EXCERPTS

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR
2      THE MIDDLE DISTRICT OF ALABAMA
3          EASTERN DIVISION
4
5  RICHARD BANKHEAD,
6      Plaintiff,
7  vs.          CIVIL ACTION NO.
8          03:07CV208-MHT
9  AMERICAN SUZUKI MOTOR
10 CORPORATION,
11     Defendant.
12
13      *   *   *   *   *
14     DEPOSITION OF RICHARD BANKHEAD,
15 taken pursuant to notice and stipulation
16 on behalf of the Defendant, in the offices
17 of Zachary T. Collins, Esquire, 207
18 Montgomery Street, Suite 215, Montgomery,
19 Alabama, before Nicole Paulk, Certified
20 Shorthand Reporter and Notary Public in
21 and for the State of Alabama at Large, on
22 September 13, 2007, commencing at 8:56
23 a.m.

## Page 2

1          APPEARANCES
2
3  FOR THE PLAINTIFF:
4      Stewart S. Wilbanks, Esquire
5      Dillard & Associates, LLC
6      Fourth Floor, Berry Building
7      2015 2nd Avenue North
8      Birmingham, Alabama 35203
9
10 FOR THE DEFENDANT:
11     John D. Mayo, Esquire
12     Lightfoot, Franklin & White, LLC
13     The Clark Building
14     400 North 20th Street
15     Birmingham, Alabama 35203-3200
16
17 ALSO PRESENT:
18     Tonya Powell
19
20
21
22
23

## Page 3

1          STIPULATIONS
2
3      It is stipulated and agreed by
4  and between counsel representing the
5  parties that the deposition of RICHARD
6  BANKHEAD may be taken before Nicole Paulk,
7  Court Reporter and Notary Public in and
8  for the State of Alabama at Large, without
9  the formality of a commission; and all
10 formality with respect to other procedural
11 requirements is waived; that objections to
12 questions, other than objections as to the
13 form of the questions need not be made at
14 this time, but may be reserved for a
15 ruling at such time as the deposition may
16 be offered in evidence or used for any
17 other purpose by either party as provided
18 by the Federal Rules of Civil Procedure.
19          I N D E X
20 Examination          Page
21 By Mr. Mayo            4
22     (No exhibits were marked in
23      this deposition.)

## Page 4

1          RICHARD BANKHEAD, of lawful
2  age, having first been duly sworn,
3  testified as follows:
4          EXAMINATION
5  BY MR. MAYO:
6  Q.  Mr. Bankhead, how are you doing today?
7  A.  All right.
8  Q.  My name is John Mayo. I'm the attorney
9      for American Suzuki Motor Company, here
10     today to talk about the accident that
11     happened on your motorcycle and a few
12     other things. And I'll just ask you --
13     I'm going to try to make my questions as
14     straightforward as possible for you, and
15     all I ask is you give me a straightforward
16     answer. And if you don't understand
17     something, feel free to ask me, and I'll
18     ask it in a better way, all right?
19 A.  Okay.
20 Q.  Fair enough?
21 A.  Yes, sir.
22 Q.  And one other thing that I -- I tend to
23     forget this -- is that the court reporter

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

1    can't hear uh-huh or huh-uh or a nod of
2    the head, so if you just say yes or no or
3    I don't know or, you know, some other
4    answer other than uh-huh or huh-uh. Is
5    that all right?
6    A.    Yes, sir.
7          MR. WILBANKS: You're doing
8               better than most clients.
9               Usually after he says that,
10              he goes, do you understand
11              that, and they go uh-huh.
12   Q.    All right. Mr. Bankhead, state your full
13         name for the record.
14   A.    Richard Emannuel Bankhead.
15   Q.    E-M-A-N-U-E-L?
16   A.    It's two Ns.
17   Q.    Two N? What's your date of birth?
18   A.    9/7/87.
19   Q.    You just had a birthday.
20   A.    Yes, sir.
21   Q.    Happy birthday.
22   A.    Thank you.
23   Q.    Where do you reside?

Page 6

1    A.    In Smith Station.
2    Q.    What's your address?
3    A.    50 Lee Road 287, Smith Station, Alabama.
4    Q.    What's that zip?
5    A.    36877.
6    Q.    Is that where you were living when the
7          accident happened?
8    A.    Yes, sir.
9    Q.    All right. I don't guess you've ever been
10         married?
11   A.    No, sir.
12   Q.    Okay. You know, people get married young
13         sometimes. All right. What's your mom's
14         name?
15   A.    Geraldine Joseph.
16   Q.    What's your dad's name?
17   A.    My real dad or my step-dad?
18   Q.    Both. What's your real dad's name?
19   A.    Richard Bankhead.
20   Q.    And your step-dad?
21   A.    Don Joseph.
22   Q.    Do you live with your step-parents?
23   A.    Well, my real dad, he died, so with my mom

Page 7

1    and my step-dad.
2    Q.    So you live with your mom and your
3          step-dad?
4    A.    Yes, sir.
5    Q.    When did your real father pass away?
6    A.    I think when I was 2.
7    Q.    Okay. Got any other brothers or sisters?
8    A.    Yes, sir.
9    Q.    What are their names?
10   A.    Shamel Kidd.
11   Q.    How do you spell that?
12   A.    S-H-A-M-E-L.
13   Q.    K-I-D?
14   A.    It's two Ds.
15   Q.    Is that her last name?
16   A.    Uh-huh.
17   Q.    How old is she?
18   A.    I think either 25 or 24.
19   Q.    Where does she live?
20   A.    I'm not -- I don't know her address.
21   Q.    Does she live in --
22   A.    Smith Station.
23   Q.    She lives in Smith Station? All right.

Page 8

1    Sister -- that was a sister?
2    A.    Uh-huh.
3    Q.    Next one?
4    A.    Lachelle (phonetic) Bankhead.
5    Q.    What did you say her first name is?
6    A.    Lachelle.
7    Q.    Lachelle?
8    A.    Yes, sir.
9    Q.    How old is she?
10   A.    I think like 30 --
11   Q.    30-something?
12   A.    Yeah, somewhere along in there.
13         30-something.
14   Q.    Does she live in Smith Station too?
15   A.    California.
16   Q.    She lives in California? All right. Next
17         one?
18   A.    Demetrius (phonetic) Ashford.
19   Q.    Can you spell Demetrius?
20   A.    I don't know.
21   Q.    All right. That's fine. Ashford?
22   A.    Yes, sir.
23   Q.    How old is he?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

Page 9

1    A.   32, I believe. And he lives in Smith
2         Station.
3    Q.   All right.
4    A.   Do I even need to name the one that's
5         dead?
6    Q.   If you have -- yeah, sure.
7    A.   Belinda Bankhead.
8    Q.   When did she pass away?
9    A.   I don't exactly remember. It was one day
10        last year.
11   Q.   It was sometime last year?
12   A.   Yes, sir.
13   Q.   Okay. Are these all your brothers and
14        sisters?
15   A.   Yes, sir.
16   Q.   You got any halfs? Half-brothers or
17        sisters?
18   A.   Darnell Joseph.
19   Q.   Darnell?
20   A.   Yes, sir.
21   Q.   How old is Darnell?
22   A.   I'm not sure.
23   Q.   Can you guesstimate?

Page 10

1    A.   I think he's in his 30s.
2    Q.   Okay. Where does he live?
3    A.   Phenix City.
4    Q.   He's a half-brother?
5    A.   Yes, sir.
6    Q.   You got any other half-brothers or
7         sisters?
8    A.   I do, but I don't really know them.
9    Q.   Do they live around the Smith Station
10        area?
11   A.   Phenix City.
12   Q.   Do you know what their names are?
13   A.   I can't remember.
14   Q.   Do you know what their last names are?
15   A.   Joseph.
16   Q.   How many of them are there?
17   A.   I think there's just -- either one or two.
18   Q.   Brothers or sisters?
19   A.   It's two sisters.
20   Q.   They live in Phenix City?
21   A.   Yes, sir.
22   Q.   Any other half-brothers or sisters that
23        you know of?

Page 11

1    A.   No, sir.
2    Q.   All right. What about -- you got any
3         step-brothers or sisters?
4    A.   Oh, that was the step.
5    Q.   Those were the steps, okay. All right.
6         Well, do you have any other ones, any
7         other steps?
8    A.   Not that I know of.
9    Q.   Okay. Do you have any other relatives in
10        the area, brother -- I mean uncle -- well,
11        let's go -- what are your grandparents'
12        names?
13   A.   Janie Mae Ashford.
14   Q.   How do you spell that? Did you say Janie
15        Mae?
16   A.   Yes, sir.
17   Q.   Where does she live?
18   A.   Smith Station.
19   Q.   Any other grandparents?
20   A.   No, sir.
21   Q.   What about -- do you have any uncles in
22        the area?
23   A.   Yes, sir.

Page 12

1    Q.   What are your uncles' names?
2    A.   Calvin Ashford.
3    Q.   Okay.
4    A.   Where do he live or --
5    Q.   Yeah, where does he live? Sorry.
6    A.   Smith Station.
7    Q.   Any other uncles?
8    A.   Willy Ashford.
9    Q.   Where does he live?
10   A.   Smith Station.
11   Q.   All right.
12   A.   Billy Selden (phonetic).
13   Q.   How do you spell that last name?
14   A.   S-L-D -- I think it's D-N.
15   Q.   Selden? What was his first name? I'm
16        sorry.
17   A.   Billy.
18   Q.   Where does he live?
19   A.   Smith Station.
20   Q.   Okay. Any others?
21   A.   That's all I can -- that I know of, that I
22        can remember.
23   Q.   All right. Do you know if you have any

Page 13

1      uncles with another last name?
2   A.  Walken White.
3   Q.  Where does he live?
4   A.  Memphis, Tennessee.
5   Q.  What about aunts?
6   A.  Diane White.
7   Q.  Does she live in Memphis too?
8   A.  Yes, sir.
9   Q.  All right.
10  A.  Jill Ashford.
11  Q.  Where does --
12  A.  Smith Station.
13  Q.  Smith Station.  Okay.
14  A.  And Charlotte Ashford.
15  Q.  Where does she live?
16  A.  Smith Station.  And that's all that I
17      know.
18  Q.  Do you know if you have any other aunts by
19      another name other than White or Ashford,
20      another last name?
21  A.  Not that I know of.
22  Q.  Do you have any other relatives in the
23      area with the last name Bankhead?

Page 14

1   A.  Not in the area, no, sir.
2   Q.  What about -- I'm not going to go through
3       all of your cousins, but do you have any
4       cousins in the area by another name other
5       than Bankhead, Ashford, Kidd, or Joseph or
6       Selden or Ashford?  Do you have any other
7       cousins you can think of with another last
8       name?
9   A.  Not that I can think of.
10  Q.  Let's talk about your employment history.
11      Where were you working at the time of the
12      accident?
13  A.  At Extreme Power Sports.
14  Q.  How long had you been working there?
15  A.  I can't exactly remember what day I
16      started.
17  Q.  You don't have to tell me what day, just a
18      general -- if you know the month and the
19      year.
20  A.  I think it was June of '06.
21  Q.  So you had only been working there a
22      couple of months before the accident
23      happened?

Page 15

1   A.  Yes, sir.
2   Q.  What were your -- what was your job when
3       you were there?
4   A.  Assembly.
5   Q.  Assembly?
6   A.  Yes, sir.
7   Q.  What does that entail?  What would you do?
8   A.  Put together, like, the stuff that comes
9       out of the crate.
10  Q.  So what kind of products -- what kind of
11      stuff are you talking about?
12  A.  Motorcycles, ATVs, jet skis, go-carts,
13      stuff like that.
14  Q.  Did they sell anything other than
15      motorcycles, ATVs, jet skis, or go-carts?
16  A.  Scooters.
17  Q.  Scooters?  What else?
18  A.  I believe that was it.  Oh, I don't know
19      what you call those things, those Rhino
20      things.
21  Q.  Some type of ATV-type of thing?  It's
22      called a Rhino?
23  A.  It's not really a four-wheeler; it's sort

Page 16

1       of like a little mini car looking thing.
2           MR. WILBANKS:  Like a big golf
3           cart kind of?
4           THE WITNESS:  Uh-huh.
5   Q.  Did they sell golf carts?
6   A.  Well, yes, sir, if somebody sold them one,
7       they did.
8   Q.  Because they had used and new?
9   A.  Yes, sir.
10  Q.  All right.  Did you actually assemble
11      motorcycles, ATVs, jet skis --
12  A.  Yes, sir.
13  Q.  And when you say assemble, what all parts
14      did you have to put on the --
15  A.  Like tires -- it just depended on what it
16      is.  Like, four-wheelers, we had to put
17      tires, springs, and the handlebars on
18      them.  And it was like the same way with
19      dirt bikes; we'd put on the front tire and
20      the fender and the handlebars and the foot
21      pegs.  Then with the motorcycles,
22      Harley-Davidsons and stuff like that, you
23      just had to put on the front tire and the

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 17

1    fender. And the crotch rockets you had to
2    put on just side mirrors and that was it.
3    It just all depended on what it was, what
4    we had to put on.
5  Q.  Uh-huh. Did you assemble the motorcycle
6    that you ended up purchasing?
7  A.  I don't think I did. I don't remember,
8    but I don't think I did.
9  Q.  And on that particular type motorcycle,
10    that Suzuki motorcycle that you purchased,
11    what would you have to do to that one
12    coming out of the box?
13  A.  Just put on the side mirrors.
14  Q.  Just the side mirrors? Did you have any
15    other duties other than assembly?
16  A.  Whenever somebody bought a motorcycle,
17    we'd have to service it, put gas and oil,
18    check the tire pressure, and that's it.
19  Q.  Did y'all ever have to take them for a
20    test drive?
21  A.  Yes, sir.
22  Q.  Did you do that?
23  A.  I didn't. They have like people there

## Page 18

1    that was longer -- that was there longer
2    than me that did it.
3  Q.  Did you ever have occasion to test drive a
4    motorcycle when you were working there?
5  A.  Not a motorcycle, but a four-wheeler or
6    something like that.
7  Q.  So you did test drive four-wheelers?
8  A.  Yes, sir.
9  Q.  You said yes?
10  A.  Yes, sir.
11  Q.  Who was your boss at Extreme -- your
12    immediate boss?
13  A.  I just remember one.
14  Q.  What was his name?
15  A.  Jason Dyre (phonetic) or Jake -- Jason
16    Gills or Dyre -- it was one of them. I
17    think it was Jason Dyre.
18  Q.  Was he one of the owners?
19  A.  He's the son of the owner.
20  Q.  Son of the owner?
21  A.  I believe the owner -- yeah, the owner's
22    name is Gill Dyer.
23  Q.  Did you have a boss that was over the

## Page 19

1    assembly area?
2  A.  Gill -- I mean Dickie Land.
3  Q.  Would he be the person that would give you
4    jobs to do, like tell you what to
5    assemble?
6  A.  Well, he was over my warehouse, but then
7    there was a dude under him that gave me
8    the job, the dude --
9  Q.  What was his name?
10  A.  Tony Whiteside.
11  Q.  You said in a warehouse. Did y'all -- so
12    you worked -- you didn't work at the
13    location where they sold stuff?
14  A.  Yeah, we worked all in the same building,
15    but it was like cut off into sections.
16  Q.  Okay. Do you still work there?
17  A.  No, sir.
18  Q.  How long has it been since you worked
19    there?
20  A.  Since December.
21  Q.  December of '06?
22  A.  Yes, sir.
23  Q.  I guess that would be the only December

## Page 20

1    that's passed. Why did you quit -- or did
2    you --
3  A.  I was fired.
4  Q.  You were fired? Did they give you a
5    reason?
6  A.  I'm not sure. They just started firing a
7    lot of people. I don't know why. I think
8    it was just they just needed help for
9    Christmas. Because everybody said around
10    -- after Christmas they get slow. So I'm
11    not really sure if that was the reason or
12    not.
13  Q.  So you worked from June -- you said June
14    to December of '06?
15  A.  Yes, sir.
16  Q.  Had you had any jobs before then, before
17    the Extreme Power Sports job?
18  A.  Not real jobs, like under the table jobs.
19  Q.  Well, tell me about them.
20  A.  Dirty South Customs.
21  Q.  Where is that?
22  A.  It was in Phenix City, then they changed
23    the name and moved to Columbus.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

### Page 21

1 Q. What did they change the name to?

2 A. Ultimate Cycles.

3 Q. When did you work there?

4 A. I don't remember when I started there. I

5     worked there for like -- I think it was

6     like four years. I can't remember.

7 Q. Was it sometime -- did you -- like 2002 to

8     2006, before then? Do you know how old

9     you were when you worked there?

10 A. I think I was -- I believe 17.

11 Q. When you started or when you quit?

12 A. When I started. I think I was. I was

13     either 16 or 17. I don't really remember.

14 Q. All right. So you think you worked there

15     for approximately four years, is that what

16     you said?

17 A. It was either three or four.

18 Q. Three or four?

19 A. I can't exactly remember.

20 Q. What did you do at Dirty South?

21 A. Mechanic.

22 Q. And I assume that they are a motorcycle

23     shop?

### Page 22

1 A. Yes, sir.

2 Q. They do custom motorcycles?

3 A. Yes, sir.

4 Q. And when you say mechanic, what all would

5     that entail?

6 A. Changing oil, changing tires, tune-ups.

7     That's about all we did with the mechanic,

8     work-wise.

9 Q. And when you say custom motorcycles, what

10     type of bikes did they work on?

11 A. Any kind.

12 Q. Both Japanese bikes and American bikes?

13 A. Yes, sir.

14 Q. Is that all you did while you were there,

15     do tune-ups and oil changes and tire

16     changes and stuff like that?

17 A. I have customized too.

18 Q. Did you ever work on the engines, other

19     than oil change and tune-up?

20 A. Not really. We didn't do anything like

21     that.

22 Q. Have you ever had any other motorcycles

23     jobs other than these two?

### Page 23

1 A. No, sir.

2 Q. What have you been doing since December of

3     '06?

4 A. Helping my cousin at his paint shop.

5 Q. What's that place called?

6 A. Anthony's Body Shop.

7 Q. He does painting?

8 A. Yes, sir.

9 Q. Motorcycles?

10 A. Anything.

11 Q. Any kind of automobile or --

12 A. Yes, sir.

13 Q. All right. Where is that located?

14 A. Smith Station.

15 Q. Who was your boss at Dirty South?

16 A. Brian Boshner (phonetic).

17 Q. Did he also work at Extreme at all?

18 A. No, sir.

19 Q. So he only worked at Dirty South?

20 A. Yes, sir.

21 Q. Is he the owner?

22 A. Yes, sir.

23 Q. And does he own Ultimate Cycles as well?

### Page 24

1 A. Yes, sir.

2 Q. Did you have any other bosses at Dirty

3     South?

4 A. Not at Dirty South, no, sir, but he had a

5     partner at Ultimate Cycles.

6 Q. Did you work at Ultimate Cycles as well?

7 A. Yes, sir.

8 Q. I know they changed the name.

9 A. Yes, sir.

10 Q. I didn't know if they changed it before

11     you went to work there. What was his

12     name?

13 A. Nelson -- I can't remember his last name.

14     I just remember his first name.

15 Q. He was a part-owner?

16 A. Yes, sir.

17 Q. Did you do the same stuff when they

18     changed the name, mechanic work?

19 A. Yes, sir.

20 Q. Okay. Do they do any assembly there,

21     other than the assembly of the custom

22     parts?

23 A. No, sir.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 25

1  Q.  I'm assuming they would do -- you'd have
2      to do some assembly once you customize it?
3  A.  Well, yes, to a certain point.
4  Q.  What type stuff would they customize on
5      bikes?
6  A.  Anything.
7  Q.  Just give me some examples.
8  A.  They scratch them, put big tire kits on
9      them, hot rod systems, exhaust, just
10     different stuff like that.
11  Q.  Have you ever -- was this the first
12      motorcycle you ever owned?
13  A.  No, sir.
14  Q.  What other motorcycles have you owned?
15  A.  I owned a Yamaha YZF600.
16  Q.  Hold on a second. Yamaha --
17  A.  YZF.
18  Q.  -- YZF600?
19  A.  Yes, sir.
20  Q.  That's one bike?
21  A.  Yes, sir. And a Suzuki GSF500. And
22      that's it.
23  Q.  Those are the only two?

Page 26

1  A.  Yes, sir.
2  Q.  All right. Where did you get the Yamaha?
3  A.  Bought it from a -- this dude from his
4      house.
5  Q.  Do you know how old it was when you bought
6      it?
7  A.  Talking about what year it was?
8  Q.  Yeah, what model year?
9  A.  I think it was a '95. It was a '95 or a
10     '96. I can't really remember. It was one
11     of the two.
12  Q.  When did you buy it?
13  A.  I don't exactly remember. I think it was
14     '04. I think it -- I'm not really sure.
15  Q.  You think it was 2004, about three years
16     ago, then?
17  A.  I believe so.
18  Q.  Okay. How much did you pay for it?
19  A.  I think it was 15.
20  Q.  1500?
21  A.  Yes, sir.
22  Q.  Do you still have it?
23  A.  No, sir.

Page 27

1  Q.  What did you do with it?
2  A.  It was stolen.
3  Q.  It was stolen?
4  A.  Yes, sir.
5  Q.  When did that happen?
6  A.  In '05, I believe. Like the beginning of
7      '05.
8  Q.  The Suzuki, the GSF500, where did you get
9      that?
10  A.  Extreme Power Sports.
11  Q.  When did you buy it?
12  A.  I don't remember, because that was my very
13     first motorcycle.
14  Q.  How old were you when you bought it?
15  A.  I can't remember.
16  Q.  Did you get it for a birthday?
17  A.  It was like an early Christmas gift.
18  Q.  An early Christmas gift? Did you buy it
19      before you got this one in '04, then?
20  A.  Yes, sir.
21  Q.  All right. Could you give me a -- can you
22      guesstimate it, to your best recollection?
23  A.  Well, it had to be '03, I think.

Page 28

1  Q.  Had you had it about a year when you got
2      that other one?
3  A.  Well -- yeah, it was '03.
4  Q.  That was your first bike?
5  A.  Yes, sir.
6  Q.  How much did you pay for that one -- or
7      how much was it?
8  A.  I believe it was 5,000. I believe --
9  Q.  You say -- go ahead.
10  A.  I think that's what it was.
11  Q.  You say you got it for an early Christmas
12      gift. Did your parents buy it for you?
13  A.  Yes, sir.
14  Q.  When I say parents, I'm assuming it was
15      your mom and your step-dad?
16  A.  My mom. It was just my mom.
17  Q.  Just your mom. Do you still have this
18      bike?
19  A.  No, sir.
20  Q.  What happened to it?
21  A.  Totaled it out.
22  Q.  You totaled it?
23  A.  Yes, sir.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

Page 29

1  Q.  Tell me about that accident. When did
2      that happen?
3  A.  Well, it wasn't really an accident for
4      them to total it out. The motor -- I
5      don't know if they had it recalled,
6      something on the motor or what. Something
7      with the motor made them total it out.
8  Q.  So did it -- when you say totaled it out,
9      did it -- so it wasn't a wreck or anything
10     like that; it just --
11 A.  Not the reason for them to total it out,
12     but I did wreck it. But that wasn't the
13     reason for them to total it out.
14 Q.  Tell me about the wreck. Was that -- let
15     me go back. When you say totaled it out,
16     I'm a little confused by what you mean.
17     Did you take it in to have it serviced and
18     they said there was a problem with it?
19 A.  Yes, sir. So they just wrote it in the
20     insurance as being totaled out since they
21     couldn't fix it.
22 Q.  All right. Where had you taken it to?
23 A.  Extreme.

Page 30

1  Q.  Extreme? When did they total it out?
2  A.  It was all -- I think it was all in the
3      same year.
4  Q.  In '03?
5  A.  '03.
6  Q.  Okay. Are these the only two motorcycles
7      that you've owned other than the one we're
8      here talking about today?
9  A.  Yes, sir.
10 Q.  So those three?
11 A.  Yes, sir.
12 Q.  Okay. You had mentioned you had one wreck
13     on this Suzuki GSF500. Other than the one
14     that you're -- that you had in August of
15     '06 last year, the one we're talking about
16     today, how many other wrecks have you had?
17 A.  On a motorcycle?
18 Q.  Yeah, on motorcycles.
19 A.  None, other than those two.
20 Q.  Just those two?
21 A.  Yes, sir.
22 Q.  All right. We'll get to the one in August
23     of '06 a little later. Tell me about this

Page 31

1      -- the one that you had on the GSF 500.
2  A.  Deer ran out in front of me.
3  Q.  Where did this happen?
4  A.  It was in Smith Station.
5  Q.  Do you know what road?
6  A.  No, sir.
7  Q.  Do you know -- was this in 2003 as well, I
8      guess?
9  A.  Yes, sir.
10 Q.  Were you injured?
11 A.  Twisted my ankle.
12 Q.  How fast were you going?
13 A.  I believe like 30 to 35, because I was
14     just slowing down to go into a curve.
15 Q.  Just describe to me what happened.
16 A.  As soon as I slowed down, a deer ran out
17     in front of me, so it was either me hit
18     the deer or go into a ditch.
19 Q.  Did you have damage to the bike?
20 A.  No, sir. Just like a cracked fairing and
21     that was it.
22 Q.  Cracked what?
23 A.  Fairing.

Page 32

1  Q.  What?
2  A.  Fairing.
3  Q.  Cracked fairing? What is that?
4  A.  It's like the side piece of a motorcycle.
5  Q.  How do you spell that?
6  A.  I'm not sure.
7  Q.  Did you have to go to the hospital or
8      anything for that?
9  A.  I was supposed to, but I didn't.
10 Q.  What do you mean, supposed to?
11 A.  They wanted me to.
12 Q.  Who is "they"?
13 A.  My mom and people like that.
14 Q.  Did the ambulance come or anything like
15     that?
16 A.  No, sir.
17 Q.  Were there any witnesses?
18 A.  No, sir.
19 Q.  You had said that you had these two
20     motorcycle wrecks. Have you been in any
21     other accidents other than these two?
22 A.  I was in a car wreck, sir.
23 Q.  Were you driving?

8 (Pages 29 to 32)

Page 33

1   A.   No, sir.
2   Q.   Have you been in any other accidents when
3        you were driving?
4   A.   I haven't even had an accident with me
5        driving, no, sir.
6   Q.   Okay.
7   A.   I hate saying that now; it might happen.
8   Q.   What's that?
9   A.   I said I hate saying that now; it might
10       happen.
11  Q.   Yeah. Knock on wood. Have you ever had
12       any speeding tickets on a motorcycle?
13  A.   Not speeding tickets.
14  Q.   Have you had any other type of tickets?
15  A.   I had a safety violation for riding
16       without a helmet and a reckless driving
17       ticket.
18  Q.   When did you get the driving without the
19       helmet ticket?
20  A.   I can't remember. I think it was -- I
21       think it was in '03.
22  Q.   Where did you get that?
23  A.   It was in Salem, Alabama.

Page 34

1   Q.   Did you have to pay a fine?
2   A.   Yes, sir.
3   Q.   What about the reckless driving? When did
4        they give you a reckless driving ticket?
5   A.   I wasn't really reckless driving. There
6        was a car in front of me and a car in
7        front of that one, so I guess the car that
8        was in front of the one in front of me
9        turned without using a signal, so the car
10       in front of me slammed on brakes, and I
11       didn't have enough time to stop, so I went
12       around into the turning lane.
13  Q.   Where was this?
14  A.   Phenix City.
15  Q.   What happened to that one?
16  A.   I had to pay a ticket and go to a safety
17       class.
18  Q.   Did you do both those things?
19  A.   Yes, sir.
20  Q.   Were these both city police on both these
21       occasions?
22  A.   One was a state trooper, and the other one
23       was a sheriff.

Page 35

1   Q.   Where was the sheriff?
2   A.   In Phenix City.
3   Q.   And the state trooper in Salem?
4   A.   Yes, sir.
5   Q.   Do you know what court you dealt with in
6        Phenix City?
7   A.   No, sir. Well, I believe it was -- I
8        don't know how they do that, because I was
9        in Phoenix City, but they called it still
10       Lee County. I don't know how they do it.
11  Q.   Okay. What about Salem? Did you go to
12       the county court?
13  A.   No, I didn't have to go to court for that.
14  Q.   You didn't have to go to court for that?
15  A.   No, sir.
16  Q.   What motorcycle were you on In Salem?
17  A.   The GSF 500.
18  Q.   What about the reckless driving?
19  A.   600.
20  Q.   The Yamaha?
21  A.   Yes, sir.
22  Q.   When did that happen, that reckless
23       driving ticket?

Page 36

1   A.   I think it was 0 -- yeah, it was '04, I
2        believe.
3   Q.   Have you had any other tickets, any --
4        motorcycle or car, otherwise?
5   A.   I had a noise violation ticket in a car.
6   Q.   Noise violation? What was that? Where
7        did you -- I don't understand. You had a
8        loud stereo?
9   A.   Yes, sir. That ticket cost more than all
10       the other ones.
11            MR. WILBANKS: Get you to keep
12            your stereo down, won't you?
13  Q.   Where did that happen?
14  A.   Columbus.
15            MR. WILBANKS: Were you playing a
16            little Lionel Richie?
17       (Off-the-record discussion.)
18            THE WITNESS: I don't remember
19            what I was playing. I just
20            remember being pulled over
21            in the turning lane and a
22            $160 ticket.
23            MR. WILBANKS: Ouch.

9 (Pages 33 to 36)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 37

1  Q.  When was that?
2  A.  It was '05.
3  Q.  What kind of car were you in?
4  A.  Cutlass Supreme.
5  Q.  We've talked about motorcycles that you've
6      had. Have you ever had a car?
7  A.  That was the only car that I had, then I
8      got a truck.
9  Q.  The Cutlass Supreme, when did you get
10     that?
11 A.  It was '05.
12 Q.  What model was it? What year model?
13 A.  I think it was an '85.
14 Q.  Do you still have it?
15 A.  No, sir.
16 Q.  What happened to it?
17 A.  Sold it.
18 Q.  When did you sell it?
19 A.  Last year.
20 Q.  You said now you have a truck?
21 A.  Yes, sir --
22 Q.  When did you buy that?
23 A.  Last year, I believe. Yeah, it was last

## Page 38

1      year.
2  Q.  How old is it?
3  A.  It's an '01.
4  Q.  All right. Other than these tickets we've
5      talked about, have you ever had a ticket
6      in a car other than the noise violation?
7  A.  No, sir.
8  Q.  Or a truck?
9  A.  No, sir.
10 Q.  And no other wrecks other than those two
11     that we talked about?
12 A.  That's it.
13 Q.  That you were driving?
14 A.  Yes, sir.
15 Q.  You said you've been in some other wrecks?
16 A.  Yes, sir.
17 Q.  Let's talk about those real quick. How
18     many wrecks were you talking about?
19 A.  Just one.
20 Q.  Just one? Tell me about that wreck.
21 A.  Somebody pulled out in front of us.
22 Q.  When you say "pulled out in front of us,"
23     who was driving?

## Page 39

1  A.  One of my friends, Jamie Elliot.
2  Q.  Were you injured?
3  A.  Yes, sir.
4  Q.  What kind of injuries?
5  A.  I hit my knees and my head on the dash.
6  Q.  Did you have to go to the doctor or
7      hospital for that?
8  A.  Yes, sir.
9  Q.  What hospital did you go to?
10 A.  I believe it was Saint Francis. I believe
11     so.
12 Q.  Did you have any surgeries or --
13 A.  No, sir. I didn't have surgery.
14 Q.  Did you have to have a cast or a brace or
15     anything like that?
16 A.  I had to wear a back brace.
17 Q.  Back brace?
18 A.  Yes, sir.
19 Q.  So you had some back injuries too?
20 A.  Yes, sir.
21 Q.  Do you still have problems with it?
22 A.  Yes, sir. I'm supposed to be still
23     wearing the back brace, but I don't do it.

## Page 40

1      It just irritates me.
2  Q.  When did this wreck happen?
3  A.  I can't -- I don't exactly remember.
4  Q.  Has it been -- do you remember what year
5      it was?
6  A.  No, sir.
7  Q.  Do you know how old you were?
8  A.  I can't exactly remember if I was 16 or
9      17.
10 Q.  I think we have some of those medicals.
11     Do you have any lasting injuries other
12     than your back injury from that accident?
13 A.  My knees.
14 Q.  Knees still bothering you?
15 A.  Yes, sir.
16 Q.  What kind of problems are you having with
17     your knees?
18 A.  They just ache from time to time, and like
19     every time I squat down and get back up,
20     my knees pop.
21 Q.  And they've been doing this since this
22     accident happened?
23 A.  Yes, sir.

10 (Pages 37 to 40)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 41

1  Q.  What kind of back problems do you have
2      from that wreck?
3  A.  All my muscles in my back are pushed to
4      one side.
5  Q.  They're all pushed to one side?
6  A.  Yes, sir.
7  Q.  Is that what a doctor told you?
8  A.  Yes, sir.
9  Q.  What kind of — is it just you have pain
10     or —
11  A.  Yes, sir.
12  Q.  — flexibility issues?
13  A.  Not really, just aches from time to time.
14  Q.  Any kind of lawsuit filed because of that
15     accident?
16  A.  I don't think it was a lawsuit, just we
17     had an insurance thing.
18  Q.  You got some insurance money?
19  A.  Yes, sir.
20  Q.  Do you know how much insurance money you
21     got?
22  A.  I think it was 15,000 -- I mean 1500, I
23     think it was.

Page 42

1  Q.  1500?
2  A.  Yes, sir.
3  Q.  Whose insurance?
4  A.  I'm not sure.
5  Q.  Do you know who the driver was of the car,
6     the other car?
7  A.  No, sir.
8  Q.  You say the -- when you were describing
9     the wreck, you said somebody pulled out in
10     front of y'all. Did y'all hit them, or
11     what happened?
12  A.  Yes, sir, we hit them from the side.
13  Q.  Do you have a -- in 2006 when this
14     accident happened, did you have a
15     motorcycle license?
16  A.  Yes, sir.
17  Q.  When did you get that?
18  A.  I think it was when I was 14.
19  Q.  What did you have to do to get the
20     license?
21  A.  Take a written test.
22  Q.  Written test?
23  A.  Yes, sir.

Page 43

1  Q.  Did you have to do a driving test?
2  A.  No, sir.
3  Q.  Do you have a regular car driver's
4     license, then?
5  A.  Yes, sir.
6  Q.  When did you get that?
7  A.  I believe either '05 or the beginning of
8     '06. I can't remember.
9  Q.  So it's been kind of recent then, huh?
10  A.  Yes, sir.
11  Q.  All right. What did you have to do to get
12     that?
13  A.  Take a written test and a driving test.
14  Q.  Have you ever had any kind of motorcycle
15     training other than the written test?
16  A.  No, sir.
17  Q.  Excuse me?
18  A.  No, sir.
19  Q.  How long have you been riding motorcycles?
20  A.  Motorcycles, not that long, but dirt bikes
21     I was riding for a while.
22  Q.  When did you start riding dirt bikes?
23  A.  I can't remember.

Page 44

1  Q.  Was it when you were 10, 12?
2  A.  I wasn't that -- I think I was like 13.
3  Q.  13?
4  A.  I believe.
5  Q.  I know that you said that these -- you had
6     owned these two motorcycles. Had you ever
7     had a dirt bike?
8  A.  Just one.
9  Q.  What was the dirt bike?
10  A.  It was a Honda XR80.
11  Q.  XR80?
12  A.  Yes, sir.
13  Q.  All right. When kid you get that?
14  A.  I don't remember.
15  Q.  When you were 13 or before that, after
16     that?
17  A.  It was after that, a little -- yes, it was
18     after that.
19  Q.  How long did you have it?
20  A.  I don't -- can't remember. I had it for a
21     while.
22  Q.  A year, two years?
23  A.  Probably a year or two.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 45

1  Q.  What happened to it?
2  A.  Sold it to Extreme.
3  Q.  Why did you sell it?
4  A.  I don't know. I wanted to get something
5      bigger, but I ended up getting a whole new
6      motorcycle.
7  Q.  What did you -- that was the -- which
8      motorcycle was that one?
9  A.  The 500.
10 Q.  Okay. So you traded it in on that one?
11 A.  Uh-huh.
12 Q.  Sort of, something like that?
13 A.  Yes, sir. It was something like -- well,
14     first we sold it to them, then a couple of
15     weeks later, I went back and got the
16     motorcycle.
17 Q.  Okay. Did y'all use that money as a down
18     payment?
19 A.  I don't exactly remember how my mom did
20     it.
21 Q.  Okay. Did you ever have any wrecks on
22     that dirt bike?
23 A.  The very first time I ever rode it, I did.

Page 46

1  Q.  What happened?
2  A.  My brother was teaching me how to ride it,
3      and he told me to ease off the clutch and
4      I wasn't really paying attention and I
5      just let it go.
6  Q.  And it jerked?
7  A.  And it came up. I went around the house
8      and layed it down.
9  Q.  I probably would have done the same thing.
10     So I take it you've been riding dirt bikes
11     and motorcycles since you were 13?
12 A.  Yes, sir.
13 Q.  Let's talk about this motorcycle that you
14     were involved in this accident in August.
15     You bought it from Extreme Power Sports?
16 A.  Yes, sir.
17 Q.  What was that make? What was the make and
18     model?
19 A.  '06 Suzuki 750.
20 Q.  You said you didn't actually assemble it
21     as part of your job, you didn't think?
22 A.  I can't remember if I actually put it
23     together or not.

Page 47

1  Q.  Who else was working there in the
2      assembly?
3  A.  Don Ivory, Jeremy Battle, and Matt -- I
4      can't remember his last name -- I think it
5      was Shines or Shins or -- I think it was
6      Shins or something like that. I can't
7      remember.
8  Q.  Did your boss, did he do any assembly?
9  A.  If it was a busy day, he did. But other
10     than that, he just rode around in the
11     parking lot.
12 Q.  That was Tony Whiteside?
13 A.  Yes, sir.
14 Q.  Did Dicky Land do any assembly?
15 A.  No, sir.
16 Q.  How much did you pay for that Suzuki?
17 A.  I think it was 10,000 -- or it was either
18     9,000, close to being 10,000. It was one
19     or the other.
20 Q.  Did y'all pay cash or finance?
21 A.  Finance.
22 Q.  Are y'all still making payments?
23 A.  Yes, sir.

Page 48

1  Q.  Did y'all finance it through Extreme?
2  A.  Through Tindall or -- I think it was
3      Tindall.
4  Q.  Tindall?
5  A.  Yes, sir.
6  Q.  Or could it have been Gold Card?
7  A.  I believe that's the name of it, Tindall.
8  Q.  Tindall?
9  A.  Yeah.
10     MR. WILBANKS: Let's go off the
11     record.
12     (Off-the-record discussion.)
13 Q.  This bike was -- the 750 was brand-new
14     when you bought it?
15 A.  Yes, sir.
16 Q.  Did it have any miles on it?
17 A.  Just 11, from them test driving it.
18 Q.  Do you know who test drove it?
19 A.  I don't remember who test drove it.
20 Q.  Was it one of these three guys?
21 A.  It was either Jeremy or a dude named Bill.
22 Q.  Bill? What was Bill's last name?
23 A.  I'm not sure.

12 (Pages 45 to 48)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 49

1  Q.  What was his job?
2  A.  Whenever somebody bought something, he had
3      to go over it with them, tell them when to
4      bring it back for servicing.
5  Q.  Okay. Did he go over that kind of stuff
6      -- or strike that. You bought the bike
7      August the 1st?
8  A.  I don't remember what day it was.
9  Q.  Well, you had the accident on August the
10     2nd. Did you buy it that day or did you
11     buy it the day before, or some other day?
12 A.  The paperwork had been going through, but
13     we had to wait on Tindall to approve it
14     before I could actually -- no, it wasn't
15     that. I had to wait to get insurance
16     before I could take it off the lot.
17 Q.  Okay. So y'all had done some paperwork
18     the day before?
19 A.  They had -- they had the paperwork on the
20     computer, but they could never print it
21     out for us to sign it. But the paperwork
22     was already, like, filled out and stuff on
23     the computer; we just had to wait to print

Page 50

1      it out and wait for them to get insurance
2      before I could leave with it.
3  Q.  But this happened the day before?
4  A.  No, it was like a couple of days before.
5  Q.  Okay. So did anybody from Extreme show
6      you how to drive it, or did they give you
7      any instruction on the bike before you got
8      it?
9  A.  No, sir.
10 Q.  Had you ever ridden one of these Suzuki
11     750s before you purchased this one?
12 A.  Yes, sir.
13 Q.  How many times?
14 A.  Once on that kind of bike, but I done rode
15     all kind of bikes before.
16 Q.  You say you had ridden this model type
17     bike one time before?
18 A.  Yes, sir.
19 Q.  How much earlier than when you purchased
20     this one?
21 A.  It was the same time I had the 500. One
22     of my friends had the 750.
23 Q.  And you rode it one time?

Page 51

1  A.  Yes, sir.
2  Q.  All right. Well, maybe you answered my
3      question. When you purchased this bike,
4      did anybody at Extreme give you any kind
5      of instructions --
6  A.  No, sir.
7  Q.  -- on how to use it?
8  A.  No, sir.
9  Q.  So when you rode it off the lot, it had 11
10     miles?
11 A.  Yes, sir.
12 Q.  And then you were driving home when the
13     accident happened, I guess, or that's the
14     same --
15 A.  I was going to a friend's house -- well,
16     it was all the same day, yeah.
17 Q.  Okay. Did you notice anything strange
18     about the bike before the accident
19     happened?
20 A.  No, sir.
21 Q.  Was it -- did this bike have any custom
22     parts on it?
23 A.  No, sir.

Page 52

1  Q.  All factory?
2  A.  Yes, sir.
3  Q.  You say that Bill -- this guy Bill's job
4      was to go over the bike and tell you when
5      to bring it back. Did he go over that
6      kind of stuff with you?
7  A.  No, sir.
8  Q.  So just tell me about the day you rode it
9      off the lot when you purchased it. Just
10     walk me through what happened.
11 A.  I didn't take it home until after I had
12     gotten off of work. I had left work, went
13     to where my car was. I got my wallet,
14     then I was going to my friend's house, but
15     I didn't ever make it there, because he
16     was going to take me to get my car so I
17     could take my car home.
18 Q.  So you were working at Extreme that day?
19 A.  Yes, sir.
20 Q.  What time was it when you left work?
21 A.  It was like 6-something. In between 6 and
22     6:30.
23 Q.  6:30 at night?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1  A.  Yes, sir.
2  Q.  So your car is in the parking lot?
3  A.  No, it was in the parking lot of Lowe's.
4      Yeah, it was in the parking lot of Lowe's.
5  Q.  Is that somewhere close by?
6  A.  It's down the street, yes, sir.
7  Q.  So did you ride the bike to Lowe's, or --
8  A.  Yes, sir.
9  Q.  So you left work, you ride the bike to
10     Lowe's?
11 A.  Yes, sir.
12 Q.  Then you got your wallet out of your car?
13 A.  Yes, sir.
14 Q.  Then where did you go?
15 A.  I was headed to my friend's house.
16 Q.  What road is that?
17 A.  It was in Phenix City.
18 Q.  You were on Highway 280?
19 A.  Yes, sir, when the accident happened.
20 Q.  All right. So there's some discrepancy to
21     me as to what road you were on, where you
22     were coming from right when the accident
23     happened. So just walk me through -- you

Page 54

1      know, you got your wallet out of your car,
2      and then what happened?
3  A.  I went and got on the highway.
4  Q.  Got on Highway 280?
5  A.  No, it was J.R. Allen Parkway.
6  Q.  Then what?
7  A.  Then I got to Phenix City by Home Depot,
8      stopped at a red light, and when I pulled
9      off from the red light, there was just a
10     flame come up, so that's when I was trying
11     to get off the bike. The bike went one
12     way, and I went the other.
13 Q.  Okay. So you stopped at the red light by
14     Home Depot?
15 A.  Yes, sir.
16 Q.  And you take a -- you're stopped at the
17     red light and then what happened?
18 A.  I just took off whenever the light turned
19     green.
20 Q.  Going straight or --
21 A.  Yes, sir, going straight.
22 Q.  So -- all right. So I guess --
23     MR. MAYO: Do you know if J.R.

Page 55

1      Allen turns into 280 right
2      there?
3      MR. WILBANKS: I don't know, but
4      I know that's a confusing
5      stretch of road, as far as
6      -- it's kind of like --
7      THE WITNESS: Yeah. It's like --
8      whenever you're on J.R.
9      Avenue, you can take a -- or
10     you can bear -- the road
11     bears to 280. It's right
12     there.
13 Q.  Okay. So when you fell off the bike, you
14     were on 280 or you were on J.R. Allen?
15 A.  I was on 280.
16 Q.  Okay. So you had veered onto 280?
17 A.  Yes, sir.
18 Q.  All right. And you say you were stopped
19     at the light and the light turns green?
20 A.  I just take off.
21 Q.  So you hit the gas?
22 A.  Yes, sir. I didn't take off real fast or
23     anything like that; I was just taking off

Page 56

1      like normal. And all of a sudden, it's
2      like a flash fire, and that's when I was
3      trying to get off of it, so I pushed the
4      bike one way, then I jumped off the other
5      way.
6  Q.  How fast were you going?
7  A.  About 10 to 15. Only going that fast --
8      they said if I had been going faster, it
9      would have probably blew up.
10 Q.  Who said that?
11 A.  The people that came out and looked at it.
12 Q.  What do you mean, the people?
13 A.  I had Brian Boshner come out and look at
14     it.
15 Q.  Is that your boss at -- or the guy that
16     owned --
17 A.  Ultimate Cycles.
18 Q.  -- Ultimate Cycles?
19 A.  And a dude named George came out and
20     looked at it.
21 Q.  What's George's last name?
22 A.  I'm not sure.
23 Q.  Do you know where he works?

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

**MERRILL LEGAL SOULTIONS**
**Court Reporting*Legal Videography*Trial Services**

## Page 57

1  A.  He owns G&B Customs.
2  Q.  And what did they tell you?
3  A.  It was electrical problems.
4  Q.  Do you know what they specifically said?
5  A.  They said wires was pinched up together or
6      something like that.
7  Q.  Did they come at the same time or
8      different times?
9  A.  Different times.
10 Q.  Who came first?
11 A.  Brian.
12 Q.  How long after the accident?
13 A.  I'm not sure. It wasn't that long.
14 Q.  Like a month, a day, week?
15 A.  It was a couple days I think.
16 Q.  What about George?
17 A.  It was like a couple of days after too.
18 Q.  So they weren't there at the same time?
19 A.  No, they weren't.
20 Q.  Did they both say the same thing?
21 A.  Yes, sir.
22 Q.  Do you know what the specific wires they
23      were talking about?

## Page 58

1  A.  No, sir.
2  Q.  Did you see the wires?
3  A.  No, sir.
4  Q.  Did they show them to you?
5  A.  No, sir. I didn't really ask for them to
6      show it to me.
7  Q.  Were you there when they looked at it?
8  A.  Yes, sir.
9  Q.  Did they have to take the bike apart, or
10     did they look at it from the outside?
11 A.  They looked at it from the outside. They
12     was like feeling on the frame and stuff
13     when they looked at it.
14 Q.  Did they say anything about this being
15     common or they had seen this before or --
16 A.  No, sir.
17 Q.  Did they say that -- did they give you any
18     kind of alternative cause, like it could
19     have been something else?
20 A.  No, sir.
21 Q.  Okay. So you say you were at the -- back
22     to the accident. You say you were at the
23     red light. Light turns green and you go,

## Page 59

1      and I guess you get up to about 10 or 15,
2      and that's when the accident happened?
3  A.  Yes, sir.
4  Q.  Did you hear any loud noise or pop or --
5  A.  No, sir. But it was a woman behind me,
6      and she said she seen smoke first. But
7      being on a motorcycle, I couldn't see it.
8  Q.  Did she tell you that?
9  A.  She talked to my mom and all that.
10 Q.  What side of the bike did the flames come
11     out of?
12 A.  The left side.
13 Q.  Was it like a -- you described it as a
14     flash fire. Did just flames come up and
15     then go away or --
16 A.  It just came up real quick and that's -- I
17     don't know if it actually went away, but
18     whenever I jumped off of it, it wasn't
19     there no more.
20 Q.  Okay. How long were you on the bike when
21     you saw the flames before you jumped off?
22 A.  Not that long, just long enough for it to
23     burn my arm.

## Page 60

1  Q.  How high did they come?
2  A.  It was like -- like right there.
3  Q.  Up to the top of your arm?
4  A.  Yes, sir.
5      MR. WILBANKS: Do you want to
6      take a break and see his
7      arm? You haven't seen his
8      arm, have you?
9      MR. MAYO: I haven't.
10     MR. WILBANKS: Pull that off for
11     him.
12     MR. MAYO: Show me where are we
13     talking about. This stuff
14     right here?
15     THE WITNESS: Right there.
16     MR. WILBANKS: Show him your
17     other arm. Turn it over and
18     show him it's the same
19     thing. Turn it over. What
20     all happened from the wreck?
21     THE WITNESS: This, that, that,
22     and I've got a mark on my
23     shoulder.

15 (Pages 57 to 60)

**2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com**
**1-800-888-DEPO**

Page 61

1    MR. WILBANKS: Go on and pull
2      that up and show him.
3    THE WITNESS: Right there from
4      when I landed on my
5      shoulder.
6  Q.  All right. So you've got some -- you had
7     burns to your left arm?
8  A.  Yeah. This is burns, road rash, and road
9     rash.
10 Q.  So you had burns on your left arm?
11 A.  Yes, sir.
12 Q.  Is that your left forearm, I guess? And
13    then you had road rash on your left
14    forearm and right forearm?
15 A.  Yes, sir.
16 Q.  That's burn -- I mean road rash?
17 A.  Road rash. I just got burned right here.
18    MR. WILBANKS: Anywhere else on
19      your body?
20    THE WITNESS: I had a mark on my
21      knee when I landed.
22 Q.  And you said you had a mark on your arm?
23    What did you have, a cut? Cut on your

Page 62

1     arm?
2  A.  Yes, sir. And then my finger right here
3     when I hit the ground too.
4  Q.  What happened to it, just a cut?
5  A.  Cut it open.
6  Q.  All right. The witness said that -- in
7     the police report -- or maybe this was
8     your statement -- that you rose up on the
9     bike. Is that like doing a wheelie?
10 A.  I guess. I don't really remember talking
11    to the police. That's what I don't
12    understand. They said I talked to them,
13    but I don't really remember. I don't
14    really remember anything after that, so I
15    guess I talked to them. That's what they
16    said, but...
17 Q.  Well, do you remember doing a wheelie?
18 A.  No, sir.
19 Q.  And you don't remember talking to the
20    police?
21 A.  No, sir. They said I did.
22 Q.  What about -- do you remember talking to
23    the ambulance?

Page 63

1  A.  Not until I got into the back of the
2     truck.
3  Q.  The back of the ambulance?
4  A.  Yes, sir.
5  Q.  So you did talk to them once you got in
6     the back of the ambulance?
7  A.  Yes, sir.
8  Q.  What about the fire people that came to
9     the scene, did you talk to any of them?
10 A.  Not that I can remember.
11    MR. MAYO: We've been going about
12      an hour and 20 minutes. Do
13      you need to take a break or
14      anything?
15    THE WITNESS: No, sir.
16    MR. MAYO: All right. We can go
17      off the record. I need to
18      take a break.
19    (Brief recess.)
20 Q.  We were talking about who you -- kind of
21    what you remember about the accident. You
22    said that you remember talking to the
23    ambulance people in the back of the

Page 64

1     ambulance?
2  A.  Yes, sir.
3  Q.  Did you talk to the witness that was
4     listed in the police report?
5  A.  I didn't, but my mom did.
6  Q.  Who do you remember talking to at the
7     accident scene?
8  A.  Only thing I remember, as soon as it
9     happened, I called the person's house I
10    was going to and my girlfriend. And after
11    that, I just remember falling out into a
12    ditch or being in there; that's it.
13 Q.  Did you pass out?
14 A.  Yes, sir. I guess when I looked down at
15    my arm and seen the blood, that's when I
16    sort of went in shock.
17 Q.  Do you know about how far it was from --
18    you said you were stopped at the red light
19    -- what the distance was from the time
20    that you're at the red light to --
21 A.  I don't know the exact distance, but it
22    wasn't that far.
23 Q.  So not far like a mile not far, or a few

16 (Pages 61 to 64)

Page 65

1      feet?
2  A.  No, a few feet. It wasn't a mile.
3  Q.  So, I mean, you were at a stop and then
4      you're going -- were you the first car in
5      line, or were you behind someone?
6  A.  I was the first.
7  Q.  First at the red light?
8  A.  Yes, sir.
9  Q.  Okay. So you didn't have anybody in front
10     of you?
11 A.  No, sir.
12 Q.  So once the light turned green, you were
13     free to go as fast as you wanted to?
14 A.  I could have.
15 Q.  Yeah. All right. So you went from zero
16     to 15, is what I'm saying, and that's when
17     the accident happened?
18 A.  Yes.
19 Q.  So you went far enough to get up to 15
20     miles an hour?
21 A.  No, it wasn't that far, but motorcycles
22     themselves are faster than a car, so
23     something like that.

Page 66

1  Q.  Okay. Do you remember smelling anything
2      before the accident?
3  A.  No, sir. I wasn't really paying
4      attention.
5  Q.  All right. Were you wearing a helmet?
6  A.  Yes, sir.
7  Q.  Yes?
8  A.  Yes, sir.
9  Q.  What about -- what kind of clothes were
10     you wearing?
11 A.  Just regular blue jeans and a tee shirt.
12 Q.  Did you have on tennis shoes or boots?
13 A.  Yes, sir, tennis shoes.
14 Q.  When you're sitting on the bike, do you
15     know where the flames came from?
16 A.  Not exactly. Not if you're sitting on it,
17     I don't know where it came from.
18 Q.  Do you remember I guess, you know, when
19     you're -- how do you ride -- I mean, is it
20     a bike where you ride sitting up like
21     this, or are you leaned over?
22 A.  You're leaned over like that.
23 Q.  Leaned over? So the flames came up and

Page 67

1      burned your arm?
2  A.  Yes, sir.
3  Q.  Would it be fair to say the flames came
4      underneath your arm or from the side?
5  A.  I guess from the side.
6  Q.  So you're riding like this, something like
7      that?
8  A.  Yes, sir.
9  Q.  And the flames came from under here?
10 A.  Yes, sir.
11 Q.  Because you did say it was your left arm,
12     right?
13 A.  Yes, sir.
14 Q.  Do you know if there's anything on the
15     bike that was burned?
16 A.  Not that I know of. You can just -- you
17     can look at it and tell that it was on
18     fire and you can see the like black smoke
19     stuff on it.
20 Q.  Anything else that you can see that you
21     know of?
22 A.  Like what?
23 Q.  Something that -- from the flames? Did

Page 68

1      any of the people that came to look at it
2      say anything about the -- about the scorch
3      marks or burn marks or anything like that?
4  A.  They were just looking at the stuff that
5      was messed up on it.
6  Q.  Okay. Because I've seen the bike, and, I
7      mean, you can obviously tell it was in a
8      wreck. It's got some, you know, scratches
9      and stuff broken on it from when you laid
10     it over. All right. So I guess let me be
11     clear about exactly how the accident
12     happened. When you -- you say you're
13     coming down the road and you jump off the
14     bike. You said you went one way and the
15     bike went the other?
16 A.  Uh-huh. Yes, sir.
17 Q.  Did you flip over this way because the --
18     did you go like this, flip over --
19 A.  No, sir.
20 Q.  -- or did you go to the side?
21 A.  I went to the side.
22 Q.  Is that gravel right there that you -- I
23     mean, I guess you fell off into some

17 (Pages 65 to 68)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 69

1    gravel to get road rash?
2  A.   I was in the turning lane, and I knew
3       there was cars behind me, so I tried to
4       jump as far as I could so I wouldn't get
5       run over.
6  Q.   So you pulled off --
7  A.   I just jumped off and pushed the bike, and
8       it ended up on one side of the road and I
9       was on the opposite side.
10 Q.   Okay. So the bike went off to the right
11      side of the road?
12 A.   Yes, sir.
13 Q.   So it was in one ditch and you were in the
14      other?
15 A.   Yes, sir.
16 Q.   So you were in the left ditch, left side
17      of the road?
18 A.   No. I was on the right, and it went the
19      left because I pushed it the way the flame
20      went.
21 Q.   So you jumped off to the right side?
22 A.   Yes, sir.
23          MR. MAYO: Just note on the

Page 70

1           record that -- would you
2           state your name?
3       MS. POWELL: Tonya Powell.
4       MR. MAYO: -- is here. And
5           you're with Zack's office?
6       MS. POWELL: Yes.
7  Q.   So what lane were you in when you saw the
8       flames?
9  A.   I was in the right lane.
10 Q.   And you say you jumped off the bike onto
11      the -- on the right side --
12 A.   Yes, sir.
13 Q.   -- into the -- and what did you land on?
14 A.   In the turning lane.
15 Q.   Do you remember rolling or sliding into
16      the grass, or did you end up in the grass?
17      Or when you stopped, where were you?
18 A.   Still in the turning lane.
19 Q.   And then you pushed the bike off and the
20      bike went off to the left?
21 A.   Yes, sir.
22 Q.   All right. And what did the bike end up
23      in?

Page 71

1  A.   It was in the grass.
2  Q.   Do you know if it hit anything? Was there
3       anything in the median for it to hit?
4  A.   No, sir.
5  Q.   Do you know if it did?
6  A.   I don't think. I don't really remember if
7       it hit anything or not. I wasn't really
8       paying attention.
9  Q.   Okay. Do you remember when -- you know,
10      once you came to a stop, how far the bike
11      was away from you?
12 A.   However wide a road is, that's how far it
13      was.
14 Q.   Was it directly across the road --
15 A.   No.
16 Q.   -- or did it go a little --
17 A.   It went a little ways in front of me.
18 Q.   All right. When the ambulance came, what
19      did they do?
20 A.   I don't really remember. I just remember
21      ending up in the back of it screaming.
22 Q.   You were in the back of it what?
23 A.   Screaming.

Page 72

1  Q.   Were you on the stretcher or --
2  A.   Yes, sir.
3  Q.   Do you remember what kind of -- did they
4       put anything on you or bandage you in any
5       way?
6  A.   They just stuck this thing on my finger,
7       and that was it.
8  Q.   Do you remember them giving you a --
9       putting you in a C-collar, putting
10      something around your neck?
11 A.   Yes, sir, they did.
12 Q.   They did?
13 A.   Yes, sir.
14 Q.   All right. What happened once you got to
15      the hospital?
16 A.   The hospital they took me to, they said it
17      wasn't -- they couldn't do anything about
18      it, so --
19 Q.   What hospital was that?
20 A.   Saint Francis.
21 Q.   What do you mean, they said they couldn't
22      do anything?
23 A.   They said they don't really deal with

18 (Pages 69 to 72)

**MERRILL LEGAL SOULTIONS**
Court Reporting*Legal Videography*Trial Services

---

Page 73

1    burns.
2  Q.  Is this a big hospital?
3  A.  Yes, sir. It's a big -- yes.
4  Q.  I mean, that's odd to me, that a hospital
5      would say they don't deal with burns.
6  A.  That's what they said. I had to unstrap
7      myself from the stretcher because they
8      wouldn't do it. I walked out of there and
9      they took me to the medical center -- or
10     my sister did.
11 Q.  That same day?
12 A.  Yes, sir.
13 Q.  So at Saint Francis, what did they do?
14 A.  Nothing.
15 Q.  You came in strapped to the board?
16 A.  Yes, sir.
17 Q.  And you were on the board the whole time
18     you were there?
19 A.  I wasn't -- I didn't really stay there
20     that long.
21 Q.  How long?
22 A.  After they told my mom they couldn't do
23     anything. And I told them to unstrap me,

---

Page 74

1      and they wouldn't, so I unstrapped myself,
2      and my sister took me to the medical
3      center.
4  Q.  What medical center?
5  A.  Columbus, I think.
6  Q.  Is that the same day?
7  A.  Yes, sir.
8  Q.  What did they do at Columbus?
9  A.  When I got there or --
10 Q.  Yeah.
11 A.  -- or what did the doctor do? Well,
12     whenever we first got there, the lady seen
13     my arm and took me straight to the back,
14     and I stayed there like an hour and a half
15     to two hours before somebody came in there
16     to look at me. And this lady came; she
17     gave me a pill to take for my pain, and
18     then after about another hour, the doctor
19     came. He looked at my arm and he left and
20     he came back about another hour, then he
21     started pulling skin off my arm, and that
22     was it. And the nurse came back and then
23     she wrapped it up.

---

Page 75

1  Q.  Did you have to go back to Columbus for
2      any checkups?
3  A.  Yes, sir.
4  Q.  How many times?
5  A.  I don't remember how many times I went; I
6      just know I had to go for therapy and like
7      putting -- checking my arm, making sure it
8      wasn't infected and stuff like that.
9  Q.  What do you mean by therapy?
10 A.  I had -- they sit there and do stuff like
11     this and then just look at it, just make
12     sure it's not infected.
13 Q.  Some type of physical therapy?
14 A.  Well, yeah, I think so.
15 Q.  Did they call it that?
16 A.  They called it something else, but I don't
17     remember what it was.
18 Q.  And this was all at Columbus or somewhere
19     else?
20 A.  It was a place combined with the medical
21     center, but it was in a different
22     building.
23 Q.  Do you know what that was called?

---

Page 76

1  A.  No, sir. It was just for people that was
2      burned.
3  Q.  Did you get any other places other than
4      Columbus, Saint Francis, and this burn
5      place?
6  A.  I went to my doctor.
7  Q.  What was his name?
8  A.  Dr. Hollingsworth.
9  Q.  Where is Dr. Hollingsworth?
10 A.  In Smith Station.
11 Q.  Is he your regular doctor?
12 A.  Yes, sir.
13 Q.  What did he do?
14 A.  The first time I went, he just looked at
15     my arm to see how bad it was, then he
16     changed the bandages and I had to go back
17     -- like he wanted me to come back after it
18     healed and he would, like, look at my arm
19     and do stuff like this to it, to make sure
20     the skin wasn't tight. That was it.
21 Q.  Did anybody tell you what degree burns you
22     had?
23 A.  I had first and second.

19 (Pages 73 to 76)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 77

1  Q.  Who told you that?
2  A.  The doctor at the medical center and my
3      doctor.
4  Q.  And the physical therapy, did you get that
5      at the burn place that was attached to the
6      hospital?
7  A.  Yes, sir.
8  Q.  Okay.
9          MR. MAYO:  Do y'all have those
10             records?
11         MR. WILBANKS:  I don't know if
12             Zack does or not, but I'll
13             find out.  If we do, I need
14             to get them anyway.
15         MR. MAYO:  If you do, send them
16             with this other production.
17             I think I asked for them.
18         MR. WILBANKS:  Let's see.  I'll
19             find out from Zack.  I don't
20             have them.  We've got the
21             charges.  I think Zack gave
22             me those in the initial
23             disclosures.

Page 78

1  Q.  All right, Richard.  When is the last time
2      you had to go see any doctor about your
3      arm?
4  A.  I don't remember when was the last time.
5      I'm going to have to go -- I can't
6      remember.
7  Q.  Do you still have to see him?  Do you
8      still have treatments for it?
9  A.  Not lately.  I believe I was supposed to,
10     but I don't really like going.
11 Q.  What do you mean, you're supposed to?
12 A.  Supposed to have checkups.  That's it.
13 Q.  What do you mean by a checkup?
14 A.  Just going for a checkup just to make sure
15     it healed the proper way and let him do
16     the little skin thing again, make sure it
17     isn't too tight.
18 Q.  When was the last time you had a checkup?
19 A.  I don't remember.  I can't remember when
20     it was.
21 Q.  Been a month, two months?
22 A.  It's been a couple months.
23 Q.  Are you supposed to go back on a regular

Page 79

1      schedule?
2  A.  I believe so.  I'm not sure.  Or if, like,
3      I call and set an appointment.  I'm not
4      really sure.  But I don't really like
5      going.  It's just another bill.
6  Q.  Do you know what your medical bills, what
7      the total is?
8  A.  No, sir.
9  Q.  So other than Saint Francis in Columbus
10     and Dr. Hollingsworth, you haven't been to
11     any other doctors?
12 A.  No, sir.
13 Q.  Do you have any doctor that you go to
14     sometimes?
15 A.  No, sir, not that I know of.
16 Q.  Have you had any lasting problems?
17 A.  My arm cramps up from time to time, and if
18     I stay in the sun too long, I get
19     sunburned real bad and it burns real bad.
20     And I'm not supposed to pick up heavy
21     things -- well, I can't pick up heavy
22     things.  They don't want -- they said it
23     might rip the skin or something.

Page 80

1  Q.  Did you have to stay in the hospital
2      overnight at Columbus?
3  A.  No, sir.
4  Q.  So they treated you and you went home?
5  A.  Yes, sir.
6  Q.  Did you have to miss work?
7  A.  Yes, sir.
8  Q.  How many days did you miss?
9  A.  I missed a couple of weeks.
10 Q.  How much were you making?
11 A.  $8 an hour.
12 Q.  Any other lasting problems with your arm?
13     Is that why -- what are you wearing that
14     thing for?
15 A.  To keep the sun from hitting it.
16 Q.  At the -- you said the accident -- or you
17     left work about 6:30.  How far was it from
18     -- how long had you been on the bike to
19     when the accident happened?
20 A.  Probably about 20 minutes.
21 Q.  So you had left work and gone straight
22     there?
23 A.  Yes, sir.

20 (Pages 77 to 80)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 81

1  Q.  Okay. So it was around 7:30, 7, sometime
2       around them?
3  A.  Yes, sir, because I think I got to the
4       medical center at like 8, 8:30.
5  Q.  Do you know if it was light, still light
6       at 7 or around then?
7  A.  Yes, sir, it was.
8  Q.  Had it been raining that day?
9  A.  No, sir.
10 Q.  I know a tow truck picked up the bike and
11      took it to a place, and I think your dad
12      picked it up -- or your step-dad picked it
13      up a couple days later; is that right?
14 A.  I believe so.
15 Q.  Has it been in your storage shed ever
16      since?
17 A.  Yes, sir.
18 Q.  Other than those two people that you said
19      came and looked at it right afterwards,
20      anyone else come and look at it?
21 A.  People from Extreme.
22 Q.  What did they say? Or who came, rather?
23 A.  Tony Eastridge and somebody named Danny,

Page 82

1       one of the mechanics.
2  Q.  What does Tony do?
3  A.  He's like the boss over the salespeople.
4  Q.  What did they say -- or did they say
5       anything?
6  A.  They didn't say anything.
7  Q.  Did they come before or after those other
8       two folks?
9  A.  Before.
10 Q.  Before?
11 A.  They came while it was still at the place
12      where it was towed to.
13 Q.  Okay. Have y'all moved it or -- moved it
14      to another location or anything since it's
15      been in that shed?
16 A.  No, sir.
17 Q.  I know that Zack pulled it out so we could
18      look at it, and I'm not counting that.
19 A.  No, sir.
20 Q.  Okay. So when Brian Boshner and George
21      from -- Brian is from Ultimate Cycles and
22      George is from G&B Customs -- when they
23      came to look at the bike, they said there

Page 83

1       were some crimped wires and said it was an
2       electrical problem is what started the
3       fire?
4  A.  Yes, sir.
5  Q.  Anything else?
6  A.  I'm not sure -- Brian wrote it down, what
7       he thought was wrong with it, but I don't
8       know exactly how he explained it.
9  Q.  Do they know what -- you know, did they
10      say anything about oil igniting or
11      gasoline or --
12 A.  No, sir. They just said it was wires
13      cramped up. They didn't say how they
14      thought about the fire started. He just
15      said the wires was cramped.
16 Q.  Cramped wires?
17 A.  Yes, sir.
18 Q.  Did they say what the wires came to or
19      from or what the wires were a part of?
20 A.  No, sir, they didn't say.
21 Q.  And you say the flames -- when you jumped
22      off the bike, the flames weren't there
23      anymore -- or you didn't see them?

Page 84

1  A.  I wasn't paying attention. I was just
2       trying to get off of it.
3  Q.  Gotcha. Well, when you -- did you ever
4       see a fire afterwards, after the accident?
5  A.  No, sir.
6  Q.  Do you know if anything around the bike
7       burned? Like after it landed, did it --
8  A.  No, sir, I don't know.
9  Q.  Okay. In the medical -- in the records
10      that we had, it did say that you got up
11      and took your collar off and left the -- I
12      guess it was Saint Francis. And you're
13      saying that's because they told you they
14      couldn't treat burns?
15 A.  Yes, sir.
16 Q.  All right. Have you ever been involved in
17      a lawsuit before?
18 A.  Not that I can remember.
19 Q.  I know that you said you got some
20      settlement money from that other accident,
21      but you don't think there was a lawsuit
22      filed?
23 A.  I don't think it was.

21 (Pages 81 to 84)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

---

Page 85

1  Q.  I guess not settlement money, but you got
2      some insurance money; isn't that right?
3  A.  Yes, sir.
4  Q.  Have you ever been deposed before?
5  A.  What's that?
6  Q.  Like this? This is a deposition. Have
7      you ever been to one of these?
8  A.  No, sir.
9  Q.  What about any legal trouble? Have you
10     ever been arrested?
11 A.  Yes, sir.
12 Q.  You have?
13 A.  Yes, sir.
14 Q.  What were you arrested for?
15 A.  Just for having a pistol without a permit.
16 Q.  When did that happen?
17 A.  It was '05.
18 Q.  What happened when you got arrested? Did
19     you have to stay in jail or --
20 A.  Had a bail bondsperson come get me out.
21 Q.  What happened with the case?
22 A.  Oh, what did I get?
23 Q.  Uh-huh.

---

Page 86

1  A.  Like, just probation.
2  Q.  Is that a misdemeanor or a --
3  A.  Misdemeanor.
4  Q.  Did you have to pay a fine?
5  A.  Yes, sir.
6  Q.  How much was that?
7  A.  I don't remember.
8  Q.  Is that the only time you've ever been
9      arrested?
10 A.  Yes, sir.
11 Q.  What kind of gun?
12 A.  I think it was a 9 millimeter. I don't
13     remember exactly what kind it was.
14 Q.  What were you doing carrying a gun?
15 A.  I had let my friend use my car and it got
16     left in there, and I got stopped leaving
17     school and it was in there.
18 Q.  Who was the salesperson that sold that
19     bike to you; do you know?
20 A.  I think it was Tony.
21 Q.  Tony Whiteside? Is that what you said?
22     Eastridge?
23 A.  Yes, sir. I think I got those last names

---

Page 87

1      confused. I think it was -- I think Tony
2      Eastridge was just a supervisor, and Tony
3      Whiteside is the salesperson.
4  Q.  Tony Eastridge was your supervisor?
5  A.  Yes, sir. I got the last names mixed up.
6  Q.  That's okay. You said you had a helmet
7      on?
8  A.  Yes, sir.
9  Q.  What type of helmet was that?
10 A.  It was a full-face.
11 Q.  Full-face?
12 A.  Yes, sir.
13 Q.  Did you buy it with the bike, or was it
14     one you already had?
15 A.  Bought it with the bike.
16 Q.  You say your sister drove you to the
17     medical center?
18 A.  Yes, sir.
19 Q.  What was her name again?
20 A.  Shamel Kidd.
21 Q.  Now, I'm not a doctor, but your arm looked
22     -- it looked pretty healed to me, just
23     looking at it. You don't have any open

---

Page 88

1      sores or anything like that?
2  A.  No.
3          MR. WILBANKS: Object to the
4          form. You can answer.
5  Q.  Have any of the doctors told you that it's
6      -- that you're healed?
7  A.  I ain't went back to have a final look at
8      them yet, but they said it was. Then they
9      said that I would have to come back for
10     them to look, make sure it healed right.
11 Q.  This is the last time you went?
12 A.  Yes, sir.
13 Q.  Do you plan on going back?
14 A.  I need to.
15 Q.  Why do you feel like you need to?
16 A.  Just to make sure everything's right.
17 Q.  Have you had any accidents or anything
18     since this accident?
19 A.  No, sir.
20 Q.  Still riding motorcycles?
21 A.  Yes, sir.
22 Q.  Yes?
23 A.  Yes, sir.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

Page 89

1   Q.   What are you riding now?
2   A.   I don't have one; I just ride my cousin's
3        motorcycle.
4   Q.   What type of bike is that?
5   A.   A CVR600.
6   Q.   Who makes that?
7   A.   Honda.
8            MR. MAYO:  I don't think I've
9                ever ridden a bike.
10           MR. WILBANKS:  Really?
11           MR. MAYO:  I don't think so.
12           MR. WILBANKS:  I had a bad bike
13               accident when I was 15.
14           (Off-the-record discussion.)
15   Q.   Do you have any medications that were
16        prescribed to you for this accident?
17   A.   Yes, sir.
18   Q.   Where did you get those filled?
19   A.   I think CVS.
20   Q.   CVS where?
21   A.   In Phenix City.  No, it was Walgreens.
22        Sorry, Walgreens in Phenix City.
23   Q.   Do you know which Walgreens?

Page 90

1            MR. MAYO:  Do y'all have those?
2   A.   There's more than one Walgreens in Phenix
3        City?
4   Q.   You tell me.
5            MR. WILBANKS:  Doubt it.
6   Q.   Do you know what road it's on?
7   A.   I don't know how they do it, is it 280 or
8        13th Street.
9   Q.   Okay.  One of those?
10   A.   Yes, sir.  It's like in a corner, so I
11        don't know how they say.
12   Q.   So they might have another address, you're
13        saying?
14   A.   Yes.
15   Q.   But it's off 13th Street?
16   A.   I'm not sure how they do it --
17   Q.   I know, but I'm asking you, if you drive
18        down 13th Street, is it right off 13th
19        Street?
20   A.   Yes, sir.
21   Q.   Okay.  Do you know what kind of
22        medications they gave you?
23   A.   I don't remember what they was.  I don't

Page 91

1        remember.  I think it was Oxycodone.
2   Q.   Something for pain?
3   A.   Yes, sir.  And there was one other one.  I
4        can't remember what that is.
5   Q.   What was that for?
6   A.   It was for pain too.
7   Q.   Did they give you anything for infection?
8   A.   Some cream stuff.
9   Q.   So other than pain meds and the cream, did
10        you have any -- did they prescribe you any
11        other medications?
12   A.   No, sir.
13   Q.   Do you still take pain meds?
14   A.   No, sir.
15   Q.   Do you use the cream?
16   A.   No, sir.
17   Q.   You said that you're not supposed to pick
18        up heavy objects with your arm?
19   A.   Yes.
20   Q.   Is there anything else that you're not
21        supposed to do or that you can't do
22        because of the accident?
23   A.   Be in the sun for a long time.

Page 92

1   Q.   Do you have health insurance?
2   A.   Yes, sir.
3   Q.   Who's your health insurance provider?
4   A.   I'm not sure, but I just know I have it.
5   Q.   Is it under your mom's work or --
6   A.   My step-dad.
7   Q.   Your step-dad's work?
8   A.   Yes, sir.
9   Q.   Where does your step-dad work?
10   A.   He does something down in Fort Benning.
11   Q.   Is he in the military?
12   A.   No, sir.  He just works out there.
13   Q.   Did you have to go -- did you go see a
14        doctor on the base because of this?
15   A.   No, sir.
16   Q.   Had you had anything to drink that day
17        before the accident?
18   A.   No, sir.
19   Q.   What about the night before?
20   A.   No, sir.
21   Q.   What about any illegal drugs?  Had you
22        been taking anything like that?
23   A.   No, sir.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

## Page 93

1       MR. MAYO: Give me about five,
2       ten minutes.
3       MR. WILBANKS: Fine, take your
4       time.
5       (Brief recess.)
6   Q.   We were talking earlier about when you
7       purchased the bike. You said you couldn't
8       drive it off the lot until you had
9       motorcycle insurance -- or insurance on
10      your motorcycle?
11   A.   Yes, sir.
12   Q.   Do you know who you got the insurance
13      from?
14   A.   I can't remember.
15   Q.   Have you been paid any insurance money
16      from anybody on this -- for this accident?
17   A.   No, because whenever it happened, whenever
18      I had the wreck, they sent my mom back the
19      check saying I didn't have insurance.
20   Q.   Who did?
21   A.   The people that I had insurance with.
22   Q.   They sent your mom the check that she had
23      sent them back?

## Page 94

1   A.   Yes, sir.
2       MR. WILBANKS: And that's --
3       MR. MAYO: That's Progressive?
4       MR. WILBANKS: I can't remember.
5       Let's go off the record.
6       (Off-the-record discussion.)
7   A.   They said they had the right VIN number
8      but instead of GSX750, they had a Katana
9      750.
10   Q.   Is there a difference?
11   A.   In the way they look. But they're still
12      made by Suzuki, it's just the look of
13      them.
14   Q.   How old were you when this accident
15      happened; do you know? I mean, I can
16      figure it out from your birthday.
17   A.   19.
18   Q.   So you were out of high school?
19   A.   Yes, sir.
20   Q.   Where did you go to high school?
21   A.   Smith Station.
22   Q.   I think your interrogatory answers said
23      that you had moved around a lot? You'd

## Page 95

1      gone to a bunch of different schools?
2   A.   Yes, sir.
3   Q.   Where did you go to school in 9th grade?
4   A.   9th grade?
5   Q.   Uh-huh?
6   A.   Mississippi.
7   Q.   Where in Mississippi?
8   A.   I think it was Walls. I lived in Walls,
9      Mississippi, but I can't remember the name
10      of the school.
11   Q.   Is it outside Senatobia? Oh, never mind,
12      then. All right. Where did you go to
13      10th grade?
14   A.   Smith Station.
15   Q.   And 11th?
16   A.   Smith Station.
17   Q.   Did you go to 12th at Smith Station?
18   A.   No, sir.
19   Q.   Where did --
20   A.   I did an online course.
21   Q.   You graduated with an online course?
22   A.   Yes, sir.
23   Q.   What did you get that through?

## Page 96

1   A.   Rocksville University or something --
2      yeah, Rocksville University.
3   Q.   Why did you do that?
4   A.   Got tired of going to school.
5   Q.   That's fair enough.
6   A.   Got tired of getting in trouble at school.
7   Q.   What kind of trouble?
8   A.   Just different stuff. I couldn't -- I had
9      ADHD, so I couldn't sit still in school,
10      so that made me get in trouble.
11   Q.   All right. What are you doing now? Are
12      you in school?
13   A.   Not yet.
14   Q.   Have you been -- have you had any -- gone
15      to any school since Rocksville?
16   A.   No, sir.
17   Q.   You said Rocksville or Rockville, which
18      one?
19   A.   I think it's Rocks.
20   Q.   Rocks. Have you gotten any kind of
21      insurance money or any kind of payments
22      from anybody as a result of this accident?
23   A.   No, sir.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 97

1    Q.    I think that's all I've got.
2            MR. WILBANKS:  I don't have
3                anything.  I did notice -- I
4                don't want you to think
5                we're trying to --
6                T-I-N-D-A-L-L.  That's
7                Tindall Federal Credit
8                Union.  I think that's
9                right.
10           MR. MAYO:  Okay.  Is that the
11               price?
12           MR. WILBANKS:  Yeah, I think so.
13           MR. MAYO:  Is that the -- are you
14               looking at our initial
15               disclosures?
16           MR. WILBANKS:  Yeah.  That's all
17               on that stuff I gave you.
18           (The deposition of RICHARD
19               BANKHEAD was concluded at
20               approximately 11:14 a.m. on
21               September 13, 2007.)
22           * * * * * * * * * * *
23           REPORTER'S CERTIFICATE

Page 98

1            * * * * * * * * * * *
2
3        STATE OF ALABAMA
4        COUNTY OF MONTGOMERY
5
6            I, Nicole Paulk, Court Reporter
7        and Notary Public in and for the State of
8        Alabama at Large, do hereby certify that
9        the foregoing is a true and accurate
10       transcript of the proceedings as taken
11       stenographically by me at the time and
12       place aforementioned.
13           This 17th day of September
14       2007.
15
16
             Nicole Paulk
17           Reporter and Notary Public
             State of Alabama at Large
18
19
20
21
22
23

25 (Pages 97 to 98)

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO